COMMISSIONER OF INTERNAL REVENUE *v.* NA-
TIONAL ALFALFA DEHYDRATING &
MILLING CO.

No. 73-9. Argued January 14, 1974—Decided May 28, 1974

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and DOUGLAS, BRENNAN, WHITE, MARSHALL, POWELL, and REHNQUIST, JJ., joined, and in Parts I, II, and III of which STEWART, J., joined. STEWART, J., concurred in the judgment.

*Stuart A. Smith* argued the cause for petitioner. With him on the brief were *Solicitor General Bork, Assistant Attorney General Crampton, Meyer Rothwacks,* and *Ernest J. Brown.*

*Charles White Hess* argued the cause for respondent. With him on the brief was *Ronald B. Stang.**

---

*Briefs of *amici curiae* urging affirmance were filed by *Thomas E. Tyre* for Cities Service Co.; by *Robert T. Molloy, James Ogden, Mark M. Hennelly, Donald E. Engle, George E. Bailey, Robert E.*

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

A corporate taxpayer in 1957 issued $50 face value 5% sinking fund debentures in exchange for its outstanding $50 par 5% cumulative preferred shares. At the time, the preferred apparently had a fair market value of less than $50 per share. This case presents the question whether, under § 163 (a) of the Internal Revenue Code of 1954, 26 U. S. C. § 163 (a),[1] the taxpayer is entitled to an income tax deduction for amortizable debt discount claimed to be the difference between the face amount of the debentures and the preferred's value at the time of the exchange.

I

The facts are stipulated. The respondent, National Alfalfa Dehydrating and Milling Company (hereinafter called "NAD" or the "taxpayer"), is a Delaware corporation organized in May 1946. It has its principal office at Shawnee Mission, Kansas. It is engaged in the business of dehydrating and milling alfalfa.

At its organization, NAD was authorized to issue $50 par cumulative preferred shares and $1 par common shares. The preferred was entitled to preferential dividends at the rate of 5% per annum and was redeemable, in whole or in part, at the discretion of the board of directors or through the operation of a sinking fund, at a stated, variable price which, in 1957, was $51 per share plus

---

*Simpson,* and *James L. Boring* for St. Louis San Francisco Railway Co. et al.; by *Alan D. Berlin, Walter J. Rockler,* and *Julius M. Greisman* for Norton Simon, Inc.; and by *Paul A. Peterson* for Fed-Mart Corp.

[1] "§ 163. Interest.

"(a) General rule.

"There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness."

accrued dividends. The sinking fund provision required that 20% of net earnings (after the payment of the preferred's dividends) was to be set aside and employed for the redemption of preferred. Any shares so redeemed were to be retired and could not be reissued. If there was a dividend arrearage, the preferred could not be purchased, redeemed, or otherwise acquired for value by the corporation unless the holders of 50% of the preferred shares consented, or unless NAD notified all preferred shareholders of its desire to purchase and invited tender offers. Upon voluntary liquidation, the preferred was entitled to $50 per share plus accrued dividends before any distribution was made to holders of the common shares.

Prior to July 23, 1957, NAD had outstanding common shares and 47,059 preferred shares on which there were dividend arrearages of $10 per share. The preferred outstanding thus had an aggregate par value of $2,352,950 as of that date.

On April 8, 1957, NAD's board of directors adopted resolutions [2] "to effectuate a reorganization of the Company by way of recapitalization." App. 56. The plan proposed by the board had three steps: (1) an amendment of NAD's articles of incorporation to eliminate the preferred as of August 1, 1957, to increase the par value of the common from $1 to $3 and the number of shares of common authorized from 763,000 to 1,000,000, and to authorize the issue of warrants for the purchase of common shares; (2) the indentured issuance of $2,352,950 principal amount of 18-year 5% sinking fund debentures due July 1, 1975, with one $50 debenture to be exchanged for each share of outstanding $50 preferred; and (3) the issuance, to the holder of each share of preferred, of a

---

[2] The resolutions are set forth in full in the opinion of the Court of Appeals. 472 F. 2d 796, 798 n. 1 (CA10 1973).

warrant to purchase one-half share of common at $10 per share in lieu of the $10 dividend arrearage. The members of the board would have testified that the "principal business purpose behind the 1957 exchange of debentures for the preferred stock was to enable National Alfalfa to expand its eastern producing areas." *Id.*, at 25.

After the board had taken this action, NAD and Fidelity-Philadelphia Trust Company, as trustee, executed a trust indenture dated July 1, 1957, pursuant to which the aforementioned debentures were to be issued in exchange for NAD's outstanding preferred.[3]

Fidelity-Philadelphia Trust Company, on behalf of NAD, requested a ruling from the United States Treasury Department as to the federal income tax consequences of the plan. A responsive letter-ruling over the signature of the Chief, Reorganization and Dividend Branch, was forthcoming on May 29, 1957. The request had sought a ruling that all aspects of the plan would be tax free. The ruling, however, was to the effect that the exchange of the $1 par common for $3 par common "will

---

[3] The indenture provided for subordination, redemption, and a sinking fund. Specifically, the debentures were to be subordinate to bank loans for inventory purposes and to obligations for materials, services, and labor supplied in the normal course of business. They were redeemable, in whole or in part, and from time to time, after July 1, 1958, at par plus accrued interest.

The sinking fund provision required NAD, after April 30, 1959, to set aside annually, for redemption of debentures at par plus accrued interest, the lesser of (a) the sum sufficient to redeem $196,080 face amount of debentures, or (b) the consolidated net earnings for the fiscal year, with the proviso that if the latter became applicable for any year, the fixed figure was to be cumulative.

NAD has not been in default in the performance of these indenture obligations. As of April 30, 1967, only $581,300 of the original $2,352,950 of debentures remained outstanding. The rest had been redeemed or otherwise repurchased or retired. App. 29.

constitute a recapitalization and, therefore, a reorganization, within the meaning of section 368 (a)(1)(E), of the Internal Revenue Code of 1954," 26 U. S. C. § 368 (a) (1)(E), and that, as a result thereof, under § 354 (a) of the Code, 26 U. S. C. § 354 (a), no gain or loss would be recognized on that exchange by NAD or by its common shareholders. App. 20. The ruling went on to state, "Assuming but not determining that the 5% debenture bonds to be issued qualify as securities (create a genuine relationship of debtor and creditor), gain or loss will be recognized to the preferred stockholders [under § 302 (a) of the Code, 26 U. S. C. § 302 (a)] from the exchange" of the preferred and the dividend arrearage for the debentures and warrants. The gain or loss so to be recognized would be "measured by the difference between the cost or other adjusted basis of the preferred stock surrendered and the fair market values of the debentures and warrants received." App. 20–21.

Shareholder approval of the plan proposed by the board was forthcoming in due course. Accordingly, NAD's articles were amended; on July 23, 1957, the holder of each share of preferred received, in exchange therefor, a $50 face value 5% debenture due July 1, 1975, and a warrant to subscribe to a half share of common at $10 per share in lieu of the dividend arrearage; and the preferred was eliminated and canceled as of August 1. This was reflected on NAD's books by a debit to the preferred stock account for $2,352,950, thereby eliminating that account, and by a credit to the liability account for the 18-year 5% debentures in the aggregate amount of $2,352,950.

NAD's preferred shares were not listed. During the period from July 15–30, 1957, the bid quotation for the preferred on the over-the-counter market ranged from a low of 29 to a high of 33, and the offering quotation

ranged from a low of 32 to a high of 35. App. 161.[4] On July 23, when the exchange was effected, the midpoint between the bid and offering quotations on the over-the-counter market was 33. The National Stock Summary for October 1, 1957, showed 100 shares of NAD preferred wanted on July 9 at 32 and on July 10 at 33, and 100 shares offered on July 10 at 35. *Id.*, at 167. It showed no quotations for the warrants in July and only nominal figure want quotations for them on four dates in August. *Id.*, at 168.

On each of its federal income tax returns for the fiscal years ended April 30, 1958, to 1967, inclusive, NAD claimed a deduction under § 163 (a) for what it regarded as interest, by reason of debt discount, measured by the difference between $33 per share for the preferred on July 23, 1957, and the face amount of the debentures. This difference amounted to $800,003 ($2,352,950 for the debentures, less $1,552,947 for the preferred). The $800,003 was then amortized on a straight-line basis over the 18-year life of the debentures, with an addition each year for the unamortized discount on any debentures currently repurchased or redeemed. See Rev. Rul. 70–353, 1970–2 Cum. Bull. 39. The deductions claimed are set forth in the margin;[5] those of the earlier years were reflected in losses carried over to fiscal 1967.

---

[4]

| Date | Bid | Offer | Date | Bid | Offer |
|------|-----|-------|------|-----|-------|
| July 15 | 33 | 35 | July 23 | 32 | 34 |
| July 16 | 32 | 35 | July 24 | 32 | 35 |
| July 17 | 32 | 34 | July 25 | 29 | 32 |
| July 18 | 31 | 34 | July 26 | 30 | 33 |
| July 19 | 32 | 34 | July 29 | 30 | 33 |
| July 22 | 31 | 33 | July 30 | 30 | 33 |

[5] The deductions for discount taken by NAD on its returns for its fiscal year 1958 through 1967 were:

Upon audit of NAD's return for fiscal 1967, the Commissioner of Internal Revenue disallowed the debt discount of $109,804 claimed for that year and $321,657 in loss carryovers from prior taxable years that were due to debt-discount deductions asserted in those years. This resulted in a substantial deficiency in NAD's 1967 corporate income tax.

On petition for redetermination, the Tax Court, by a unanimous reviewed opinion, upheld the Commissioner. 57 T. C. 46 (1971). Adopting the reasoning of the Court of Claims in *Erie Lackawanna R. Co.* v. *United States,* 190 Ct. Cl. 682, 422 F. 2d 425 (1970), and in *Missouri Pacific R. Co.* v. *United States,* 192 Ct. Cl. 318, 427 F. 2d 727, modified on rehearing, 193 Ct. Cl. 257, 433 F. 2d 1324 (1970), cert. denied, 402 U. S. 944 (1971), the Tax Court held that when a corporation issues obligations in exchange for its outstanding preferred, no discount arises if the amount that had been received upon the issuance of the preferred was equal to

| Year Ended | Unamortized Discount On Bonds Currently Repurchased or Redeemed | Straight-line Amortization | Total |
|---|---|---|---|
| 4/30/58 | —0— | $37,037 | $37,037 |
| 4/30/59 | $20,104 | 43,273 | 63,377 |
| 4/30/60 | 17,007 | 42,310 | 59,317 |
| 4/30/61 | —0— | 28,743 | 28,743 |
| 4/30/62 | 14,062 | 27,751 | 41,813 |
| 4/30/63 | —0— | 27,751 | 27,751 |
| 4/30/64 | 26,624 | 25,562 | 52,186 |
| 4/30/65 | 37,903 | 22,168 | 60,071 |
| 4/30/66 | 4,139 | 21,761 | 25,900 |
| 4/30/67 | 98,824 | 10,980 | 109,804 |
| | | | $505,999 |

App. 28.

the face amount of the obligations issued upon the exchange. The market value of the preferred at the time of the exchange, therefore, would be of no relevance.

On appeal, the United States Court of Appeals for the Tenth Circuit, by a divided vote, reversed. 472 F. 2d 796 (1973). Relying upon *American Smelting & Refining Co.* v. *United States,* 130 F. 2d 883 (CA3 1942), and *Atchison, T. & S. F. R. Co.* v. *United States,* 443 F. 2d 147 (CA10 1971), the court held that the difference between the value of the preferred and the face amount of the debentures at the time of the exchange represented a discount or expense of borrowing, and qualified as an interest deduction to be properly amortized over the life of the debentures. We granted certiorari to resolve the indicated conflict. 414 U. S. 817 (1973).

## II

The situation with which we are here concerned, therefore, is one where a taxpayer corporation issued debt obligations, namely, debentures, in exchange for its *own* outstanding preferred shares. It is not one where the taxpayer issued debt obligations in exchange for cash in an amount less than the obligations' face amount, or in exchange for property other than its own stock.

Section 163 (a), which is set forth in n. 1, *supra,* is the statute NAD seeks to invoke in order to have the benefit of a deduction for what it claims is amortizable debt discount. The statute relates simply to "all interest paid or accrued within the taxable year on indebtedness." NAD's debentures obviously represented debt, and the stated 5% interest due semiannually on those debentures just as obviously would qualify as a deduction from gross income for NAD under § 163 (a). The issue here, however, is whether NAD is also entitled, in addition to the deduction for the stated interest, to a further deduction,

as "interest paid or accrued," for an appropriately amortized portion of the claimed $17 difference between the face amount of each $50 debenture and the value of each share of preferred on July 23, 1957.

Original-issue discount typically arises where an issuer sells its debt obligation on the market for *cash* at a price less than the face amount of the obligation. The difference, obviously, is the discount. A simple example is where a corporation issues its 6% $1,000 10-year bond for $950 cash. The corporation is obliged to pay and the bondholder is entitled to receive, the stated annual interest of 6%, or $60. That amount is deductible by the corporation and is includable in the payee's gross income as interest received. But the $50 difference between the face amount of the obligation and the issue price is an additional cost to the issuing corporation for the use of the money it is borrowing. That cost spread over the 10-year life of the bond amounts to $5 per year. Accepted accounting practice treats this discount as interest under § 163 (a).[6]

The Internal Revenue Code of 1939 and its predecessors did not provide explicitly for amortization and deduction of debt discount. The successive regulations, however, beginning with Art. 150 of Treasury Regulations 33 (revised 1918), issued under the Revenue Act of 1916, have provided for such amortization and deduction by the issuer.[7]

---

[6] See H. Finney & H. Miller, Principles of Accounting, Intermediate 263 (6th ed. 1965); W. Meigs et al., Intermediate Accounting 683–688 (3d ed. 1974).

[7] Art. 544 of Regulations 45, promulgated under the Revenue Act of 1918; Art. 545 (3) (a) of Regulations 62, 65, and 69, promulgated, respectively, under the Revenue Acts of 1921, 1924, and 1926; Art. 68 (3) (a) of Regulations 74 and 77, promulgated, respectively, under the Revenue Acts of 1928 and 1932; Art. 22 (a)–

The first statutory recognition of bond discount appeared in § 1232 (b)(1) of the 1954 Code. That section provides:

"For purposes of subsection (a), the term 'original issue discount' means the difference between the issue price and the stated redemption price at maturity...."

Section 1232 (b)(2) defines "issue price" in some detail.[8]

---

18 (3)(a) of Regulations 86, 94, and 101, promulgated respectively, under the Revenue Acts of 1934, 1936, and 1938; and § 29.22 (a)–17 (3)(a) of Regulations 111, promulgated under the Internal Revenue Code of 1939. See *Montana Power Co.* v. *United States,* 232 F. 2d 541, 546-548 (CA3), cert. denied, 352 U. S. 843 (1956).

Under the 1954 Code, the relevant provision first appeared in the Income Tax Regulations as § 1.61–12 (c)(3) concerning gross income:

"If bonds are issued by a corporation at a discount, the net amount of such discount is deductible and should be prorated or amortized over the life of the bonds...."

Since the issuance of T. D. 6984, 1969–1 Cum. Bull. 38, this same language has appeared under the interest deduction provision in § 1.163–3 (a)(1).

[8] The 1954 Code's § 1232 (b)(2) was amended by the Interest Equalization Tax Act, Pub. L. 88–563, § 5, 78 Stat. 845, and by the Tax Reform Act of 1969, Pub. L. 91–172, § 413 (b), 83 Stat. 611, applicable to bonds and other evidences of indebtedness issued after May 27, 1969. As so amended, the statute, in pertinent part reads:

"In the case of a bond or other evidence of indebtedness [other than a bond or other evidence of indebtedness . . . issued pursuant to a plan of reorganization within the meaning of section 368 (a) (1)], which is issued for property and which—

"(A) is part of an issue a portion of which is traded on an established securities market, or

"(B) is issued for stock or securities which are traded on an established securities market,

"the issue price of such bond or other evidence of indebtedness . . . shall be the fair market value of such property. Except in cases

This Court has recognized debt discount as an additional cost incurred in borrowing money. In *Helvering* v. *Union Pacific R. Co.,* 293 U. S. 282 (1934), in considering Art. 150 of Regulations 33 (revised 1918), which described bond discount as a "loss" to be "prorated over the life of the bonds sold," the Court referred to discount not only as a loss but also as "interest paid for the use of capital procured by a bond issue." 293 U. S., at 286. More recently, in *United States* v. *Midland-Ross Corp.,* 381 U. S. 54 (1965), we clarified any ambiguity that may have resulted from the interest-loss approach when we stated, *id.,* at 57:

> "Earned original issue discount serves the same function as stated interest . . . . [I]t is simply 'compensation for the use or forbearance of money.' *Deputy* v. *du Pont,* 308 U. S. 488, 498."

It was also observed that,

> "despite some expressions indicating a contrary view, this Court has often recognized the economic function of discount as interest." *Id.,* at 66 (footnote omitted).

Accordingly, the discount may result ultimately in income to the purchaser,[9] but when amortized over the life of the obligation, it is deductible by the issuer.

---

to which the preceding sentence applies, the issue price of a bond or other evidence of indebtedness . . . which is issued for property (other than money) shall be the stated redemption price at maturity."

Inasmuch as NAD's debentures were issued in 1957, the 1969 amendment is not applicable to the transaction.

[9] It was unsettled for some time whether income realized by an owner of an original discount obligation was taxable to that owner as ordinary income or as capital gain. In *Commissioner* v. *Caulkins,* 144 F. 2d 482 (CA6 1944), decided under the 1939 Code, it was held that gain upon surrender of an installment certificate issued at

While it is thus established that debt discount may ensue when a corporate debt obligation is issued at a discount for cash, this Court has never decided the question whether discount may result when debt obligations are issued in exchange for property other than cash. Those courts that have passed upon the issue have reached opposing conclusions. Compare *Nassau Lens Co. v. Commissioner*, 308 F. 2d 39 (CA2 1962); *American Smelting & Refining Co. v. United States*, 130 F. 2d 883 (CA3 1942); *Southern Fertilizer & Chemical Co. v. Edwards*, 167 F. Supp. 879 (MD Ga. 1955), to the effect that debt discount is available, with *Southern Natural Gas Co. v. United States*, 188 Ct. Cl. 302, 412 F. 2d 1222,

---

a discount was capital gain. Other circuits, however, thereafter held that income attributable to the discount was ordinary income. See, for example, *Real Estate Investment Trust v. Commissioner*, 334 F. 2d 986 (CA1 1964), cert. denied, 381 U. S. 911 (1965); *Dixon v. United States*, 333 F. 2d 1016 (CA2 1964), aff'd, 381 U. S. 68 (1965); *United States v. Harrison*, 304 F. 2d 835 (CA5 1962), cert. denied, 372 U. S. 934 (1963); *Rosen v. United States*, 288 F. 2d 658 (CA3 1961); *Commissioner v. Morgan*, 272 F. 2d 936 (CA9 1959).

The issue was settled by the decision in *United States v. Midland-Ross Corp.*, 381 U. S. 54 (1965), when the Court held that earned original issue discount is not entitled to capital gain treatment under the 1939 Code.

Congress, in enacting § 1232 of the 1954 Code, adopted a different approach to earned original issue discount, referring to it as "a form of interest income" in S. Rep. No. 1622, 83d Cong., 2d Sess., 112 (1954). Under § 1232 (a) (2), gain from the sale or redemption of a corporate obligation issued at a discount is taxed as the gain from the sale of a noncapital asset. If the obligation is held by the original purchaser to maturity, the entire amount of the discount is so taxed, but if it is sold or redeemed before maturity, only the portion accrued up to the date of sale or redemption is so taxed. See De Kosmian, Original Issue Discount, 22 Tax Lawyer 339, 340–347 (1969); Zafft, Discount Bonds—Ordinary Income or Capital Gain?, 11 Tax L. Rev. 51 (1955).

1235–1239 (1969); *Montana Power Co.* v. *United States,* 141 Ct. Cl. 620, 159 F. Supp. 593, cert. denied, 358 U. S. 842 (1958); *Montana Power Co.* v. *United States,* 232 F. 2d 541 (CA3) (en banc),[10] cert. denied, 352 U. S. 843 (1956), to the effect that it is not available. This, of course, is a broader question than the one presented in the present case, and we need not, and do not, decide that broader issue. We are concerned, instead, only with the narrow issue whether debt discount arises where a corporate taxpayer issues an obligation in exchange for its own outstanding preferred shares.

In order properly to determine whether debt discount may be said to arise in such a situation, it becomes necessary to recognize the reason or factor that has been thought to justify the deduction. This has been the economic resemblance, in both form and function, which bond discount bears to stated interest for which the Revenue Acts and the Codes have allowed a deduction. Although, as has been noted, there has been some descriptive confusion in the regulations, with their references to "loss" as well as to "interest," and, as has also been noted, this Court, in *Helvering* v. *Union Pacific R. Co.,* 293 U. S., at 286, seemed to describe discount both as "interest paid for the use of capital" and as "loss resulting from the funding operation," the relevant inquiry in each case must be whether the issuer-taxpayer has incurred, as a result of the transaction, some cost or expense of acquiring the use of capital. It is to that inquiry we now turn.

### III

It is NAD's position, of course, that amortizable bond discount arose on the exchange of its debentures for its

---

[10] Judge Kalodner, joined by Judge Staley, observed, "The American Smelting decision in that respect must be limited to its facts." 232 F. 2d, at 546.

outstanding preferred. It, and the Court of Appeals' majority, would look to what it calls the "economic realities" of the transaction in order to determine whether a cost of borrowing was incurred. The Court of Appeals likened the transaction to one where the corporation actually issued its $50 debenture for $33 in cash upon the open market (or to a holder of preferred) and then used that cash to purchase and retire outstanding preferred at $33 per share. 472 F. 2d, at 802. Upon such a transaction, it is claimed, there can be no question whatsoever that a deductible discount of $17 per debenture would result. It is argued that to deny similar treatment to the transaction which did take place, where a direct exchange was made with the preferred shareholder, would require a corporate taxpayer in the future to engage in a complex and expensive series of securities transactions in order to establish its entitlement to a deduction.

This argument, however, calls upon this Court to take two steps that we are reluctant and unwilling to take. First, it would require rejection of the established tax principle that a transaction is to be given its tax effect in accord with what actually occurred and not in accord with what might have occurred. Second, it would require us to speculate about the market price and value to the corporation of the debentures in question had they been sold upon the open market.

Even if we were to assume, *arguendo*, that the hypothetical transaction posed by the taxpayer and the Court of Appeals was indistinguishable, as a matter of economic reality, from what actually occurred, we would not be required, for that reason alone, to recognize a claimed deduction for debt discount. The propriety of a deduction does not turn upon general equitable considerations, such as a demonstration of effective economic and practi-

cal equivalence. Rather, it "depends upon legislative grace; and only as there is clear provision therefor can any particular deduction be allowed." *New Colonial Ice Co.* v. *Helvering,* 292 U. S. 435, 440 (1934); *Deputy* v. *Du Pont,* 308 U. S. 488, 493 (1940). This Court has observed repeatedly that, while a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not, *Higgins* v. *Smith,* 308 U. S. 473, 477 (1940); *Old Mission Portland Cement Co.* v. *Helvering,* 293 U. S. 289, 293 (1934); *Gregory* v. *Helvering,* 293 U. S. 465, 469 (1935), and may not enjoy the benefit of some other route he might have chosen to follow but did not. "To make the taxability of the transaction depend upon the determination whether there existed an alternative form which the statute did not tax would create burden and uncertainty." *Founders General Corp.* v. *Hoey,* 300 U. S. 268, 275 (1937); *Television Industries, Inc.* v. *Commissioner,* 284 F. 2d 322, 325 (CA2 1960); *Interlochen Co.* v. *Commissioner,* 232 F. 2d 873, 877 (CA4 1956). See *Gray* v. *Powell,* 314 U. S. 402, 414 (1941).

Both the rationale and the wisdom of the Court's attitude toward such attempts at reconstruction of transactions are particularly well demonstrated in the present case. In the absence of any actual or even attempted sales of debentures or purchases of the preferred by NAD in the open market, the Court is called upon to speculate as to what the market price and the investor reaction to such events would have been. There are several reasons why we cannot do this:

First, there is nothing in the record establishing the cash price at which the debentures could have been sold upon the market had they been offered for sale. The current rate for money and the credit status of the bor-

rower are pertinent factors in the determination of discount (or premium) on an open market, as contrasted with a closed transaction.

Second, there is also nothing in the record to indicate that NAD would have been able to purchase all its outstanding preferred on the open market, or at what price that quantity of stock would have been purchased in light of the impending exchange. See *Gulf, M. & O. R. Co.* v. *United States*, 339 F. Supp. 489 (SD Ala.), final decision 31 A. F. T. R. 2d 73–436 (1972), pending on appeal to CA5 and deferred awaiting the decision in this case; *Cities Service Co.* v. *United States*, 316 F. Supp. 61 (SDNY 1970) and 362 F. Supp. 830 (SDNY 1973), appeal to CA2 pending. The stipulated over-the-counter quotations, set forth in n. 4, *supra*, and in the cited National Stock Summary, are quotations only for what at most was a thin market, and were hardly representative of the fair market value of the entire 47,059 preferred shares outstanding. The preferred's redemption price at the time was $51 plus the arrearage, or a total of $61, almost double the claimed $33 per share.

Third, when a corporation issues to its preferred shareholders its own new debt obligations in exchange for outstanding preferred, the claimed fair market value of both securities is somewhat artificial since the exchange is effectively insulated from market forces by the intracorporate and private nature of the transaction. See *Missouri Pacific R. Co.* v. *United States*, 192 Ct. Cl., at 324–325, 427 F. 2d, at 730–731. The economics underlying discount is that it is an adjustment of the difference between the interest prescribed in the instrument issued and the prevailing market rate for money, and it arises because the prescribed rate is too low to sell the obligations at par in that market. See *San Joaquin Light & Power Corp.* v. *McLaughlin*, 65 F. 2d 677, 679 (CA9

1933). Thus, implicit in the concept of debt discount is the assumption, and indeed the requirement, that the transaction be subject to the exigencies of the competitive money market.

Here, there has been no demonstration that the difference between the claimed $33 per share value of NAD's preferred (laying aside for the moment the aforementioned difficulties in arriving at that determination) and the face amount of the debentures is attributable to debt discount. As the Tax Court noted, 57 T. C., at 52 n. 6, there is no evidence of what the fair market value of the bonds was at the time of their issuance. Other factors that would have to be considered would include NAD's financial condition at the time of the exchange, including both its credit position and its profits prospects, and the availability and cost of capital in the general market as well as from its preferred shareholders. Normally, the market itself performs this evaluative process. Aside from the fact that the transaction was insulated from the market processes, there has been no attempt here to show that the discount rate was determined with a view toward accounting for these several factors rather than simply having been predicated on the par value of the preferred. Accordingly, the requisite evaluation of the property to be exchanged cannot occur in this intracorporate transaction and debt discount cannot be determined. Cf. *Gulf, M. & O. R. Co.* v. *United States, supra; Southern Fertilizer & Chemical Co.* v. *Edwards,* 167 F. Supp., at 881.

## IV

It has not been demonstrated that NAD, by the exchange, incurred any additional cost for the use of capital. NAD merely replaced that portion of its paid-in capital represented by its preferred with paid-in capital represented by its debentures. From the perspective of the

corporation, the transaction was the exchange of one form of interest or participation in the corporation for another. But the corporate assets were neither increased nor diminished.[11]

To be sure, upon the issuance of its debentures, NAD assumed a fixed obligation to pay at a date certain. The transaction, therefore, perhaps could be said to be something more than a mere reshuffling of the corporation's capital structure, see *Helvering* v. *Southwest Consolidated Corp.*, 315 U. S. 194, 202 (1942), since a creditor was substituted for a holder with an ownership interest.[12] But again, when viewed from the corporation's perspective, and regardless of the income tax effect upon the former preferred shareholder, which we deem to be irrelevant, there has been no new capital acquired and no additional cost incurred in retaining the old capital. See *St. Louis-S. F. R. Co.* v. *United States*, 195 Ct. Cl. 343, 350, 444 F. 2d 1102, 1106 (1971), cert. denied, 404 U. S. 1017 (1972).

---

[11] In *Old Mission Portland Cement Co.* v. *Helvering*, 293 U. S. 289 (1934), where original issue discount bonds were held by an affiliate of the issuing corporation, the Court concluded that a deduction for the discount was not available when the affiliated corporations filed a consolidated income tax return. The situation was related to that of a single taxpayer purchasing its own bonds prior to maturity. Because, viewing the affiliates as a single taxpaying entity, there was no obligation to pay the face amount at maturity, the issuer "could not afterwards deduct, from gross income, the amortized discount on the bonds, in anticipation of their payment at maturity." *Id.*, at 292. Here NAD incurred no additional obligation because of the substitution of its debentures for its preferred.

[12] While in no sense implying that the securities were equivalent, the Court in the past has noted that the investment difference between preferred shares and unsecured debentures can be of slight degree, and is further diminished when, as here, the debentures are subordinated. *John Kelley Co.* v. *Commissioner*, 326 U. S. 521 (1946).

In obvious explanation of this, NAD originally received $50 cash for each share of preferred. Although it was not obligated to repay that sum at any fixed time, it made use of that cash pursuant to the provisions of its articles, including both the sinking-fund and the redemption-liquidation provisions. Upon the exchange, the corporation canceled the preferred, and thus eliminated the preferred stock account upon its books, together with the preferred's attendant obligations. The market value of the preferred at that moment bore no direct relationship to the amount of funds on hand. The capital "freed" by the cancellation of the preferred was merely transferred to the liability account for the debentures. No new capital was involved. See *Claussen's, Inc.* v. *United States,* 469 F. 2d 340 (CA5 1972).[13]

It is true that there was some change in the corporate structure. Henceforth, NAD would receive a deduction for interest paid on the debentures, whereas the 5% dividend paid on the preferred had not been deductible. The common shareholders were benefited by the elimination of the dividend arrearages on the preferred and by the elimination of the premium payable on the preferred's retirement. Yet the change was not great. The fixed interest on the debentures was equal to the cumulative dividend on the preferred, and both the preferred and

---

[13] "We simply cannot overlook the complete lack of substance to the claims of the corporation here. Its assets were not diminished by a penny, either when the debentures were issued to the stockholders or where the face amount of the bonds was assumed by Fuqua (thus, presumably reducing the amount of the purchase price). The company paid nothing more to the bond-holders at any time than the current interest. It did not sell them to anyone at a discount. It issued them either as dividend, partial distribution of earned income and capital, or as 'boot' in a tax-free reorganization. It cannot deduct as interest what it has not paid out or become liable to pay out to anybody." 469 F. 2d, at 344 n. 11.

the debentures worked equal diminutions in the earnings otherwise available for the common shareholders. The debentures, of course, were to mature in 1975, but the sinking fund provisions for both the preferred and the debentures were comparable. Thus, the interest of the preferred shareholders "was fairly reflected in the highly equivalent characteristics of the debentures into which the preferred was converted." *Penfield* v. *Davis,* 105 F. Supp. 292, 311 (ND Ala. 1952), aff'd, 205 F. 2d 798 (CA5 1953). The cost of the capital invested in the corporation was the same whether represented by the preferred or by the debentures, and was totally unaffected by the market value of the shares received at the time of the issuance of the debentures. Accordingly, while recognizing the alteration which did occur in the corporation's capital structure, we conclude that the substitution by NAD of its debentures for its previously outstanding preferred, without more, did not create an obligation to pay in excess of an amount previously committed, or establish the base upon which debt discount can arise.

In sum, the alteration in the form of the retained capital did not give rise to any cost of borrowing to NAD. The fact that the preferred may have been worth something in the neighborhood of only $33 per share on the market at the time of the exchange was of no consequence, since NAD was not required to go into that market and purchase those shares. It was able, instead, to obtain the preferred merely by canceling the $50 obligation per share on its equity account and transferring that amount to its debt account. It is in this sense that an exchange of a corporation's own outstanding preferred for newly issued debt obligations may differ, in the tax sense, from an exchange for other property. Such other property—for example, inventory or the stock

of another corporation—does not equate with a previous contribution of capital which can continue to be utilized by the corporation at no cost upon cancellation of the preferred equity account.

We hold, accordingly, that NAD did not incur amortizable bond discount upon the issuance of its $50 face value 5% debentures in exchange for its outstanding $50 par cumulative preferred stock. The judgment of the Court of Appeals is reversed.

*It is so ordered.*

Mr. JUSTICE STEWART concurs in the judgment and in Parts I, II, and III of the Court's opinion.