UNITED STATES of America, Plaintiff,

v.

**Leonhard and June WODTKE, Individually and as Trustees for Life Science Church of Oto, Iowa, and Order of Almighty God, Oto, Iowa, John Hancock Mutual Life Insurance Company, Defendants.**

No. C 82–4004.

United States District Court,
N.D. Iowa, W.D.

Dec. 26, 1985.

Leonhard and June Wodtke, pro se.

Janet Brown for John Hancock Mut. Life Ins. Co.

David A. Slacter, Trial Atty., Tax Div., U.S. Dept. of Justice, Washington, D.C., Asher E. Schroeder, Asst. U.S. Atty., Sioux City, Iowa, for U.S.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, MEMORANDUM DECISION AND ORDER

DONALD E. O'BRIEN, Chief Judge.

This matter comes before the Court after a three-day trial to the Court. The Court finds for the plaintiff, United States of America. The Court hereby makes the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

1. This matter came on for trial. Plaintiff, the United States, was represented by David A. Slacter and Asher E. Schroeder. Defendants Leonhard and June Wodtke appeared *pro se* and Defendant John Hancock Mutual Life Insurance Company (John Hancock) was represented by Janet Brown.

2. Plaintiff instituted this action to reduce tax assessments made against Leonhard and June Wodtke to judgment. The plaintiff also sought to foreclose its tax liens against certain real property, a farm owned by Leonhard and June Wodtke.

3. Leonhard and June Wodtke are husband and wife residing on a 300–acre farm in Oto, Iowa, in the county of Woodbury.

4. The Wodtkes purchased this farm in 1954. (Plaintiff's Exh. 10).

5. The Wodtkes obtained a mortgage from John Hancock in order to purchase the farm. (Defendants' Exh. 102). As of the day prior to trial, the outstanding balance due on the mortgage with interest and attorneys' fees was $20,557.75. Interest continues to accrue on this amount.

6. During the years 1973 and 1974, the Wodtkes derived income from their farm and a gasoline service station operated by Leonhard Wodtke.

7. The Wodtkes filed timely tax returns for 1973 and 1974 and paid the amount of tax shown to be due and owing on these returns. (Plaintiffs Exhs. 6 and 7).

8. In January of 1975, Revenue Agent John Mansfield of the Sioux City, Iowa office of the Internal Revenue Service was

assigned to audit the Wodtkes' tax returns for the years 1973 and 1974.

9. Mansfield began working on the audit in early July of 1975 at which time he wrote a letter to the Wodtkes informing them of the audit.

10. Mansfield began his audit shortly thereafter. The Wodtkes refused to supply substantiation for the deductions they claimed on their tax returns.

11. Because Mansfield had to leave Sioux City for additional training, the audit was taken over by Revenue Agent Robert Ackerman, also of the Sioux City Internal Revenue Service office.

12. Mr. Ackerman served an Internal Revenue Service summons on the Wodtkes which asked them to produce all records and other documents which substantiated the deductions claimed on their tax returns for 1973 and 1974.

13. The Wodtkes refused to comply with the summons based on Fifth Amendment grounds. The United States District Court for the Northern District of Iowa ultimately determined that the Wodtkes had interposed the Fifth Amendment in good faith and they therefore did not have to produce any records.

14. Mansfield returned from training by the time the summons issue was decided. In order to complete his audit he used the information left that was available. This information included a letter from Standard Oil listing the amount expended by the Wodtkes during 1973 and 1974 for gasoline and other products and for rent. Mansfield also had some employment tax forms which were produced by the Wodtkes.

15. Because the Wodtkes refused to supply any further substantiation of expenses, Mansfield disallowed all deductions claimed by the Wodtkes on their tax returns for these two years other than the deductions substantiated by the documents he did have.

16. Mansfield authored a report which set forth the results of his audit. This report broke down each of the two years into farm and service station expenses. In each area, Mansfield disallowed all business deductions claimed by the Wodtkes other than those substantiated by written documentation. Mansfield's stated reason for so doing was the Wodtkes' failure to produce any written substantiation for their deductions. (Plaintiff's Exh. 2).

17. Mansfield's audit report was incorporated into a notice of deficiency mailed to the Wodtkes by certified mail on March 21, 1977. (Plaintiff's Exh. 1).

18. The notice of deficiency proposed deficiencies for the years 1973 and 1974 as follows:

| Year | Addition to Tax | Negligence Penalty |
|------|-----------------|--------------------|
| 1973 | $70,787.60 | $3,539.38 |
| 1974 | 95,865.62 | 4,793.28 |

The notice of deficiency was essentially the same as Mansfield's audit report except that certain math errors were corrected and a penalty for negligence or intentional disregard for rules and regulations was imposed pursuant to § 6653(a) of the Internal Revenue Code.

19. Mr. Wodtke filed a timely petition with the United States Tax Court to contest the audit determination of the Internal Revenue Service.

20. Mrs. Wodtke did not petition the Tax Court.

21. The Internal Revenue Service is precluded by statute from assessing taxes proposed in a notice of deficiency for 90 days after mailing of the notice. This is to give a taxpayer time to petition the Tax Court. If a petition is filed, the taxes cannot be assessed until after the Tax Court decision is final.

22. The Internal Revenue Service assessed the taxes proposed in the notice of deficiency against Mrs. Wodtke after the expiration of the 90–day period on August 24, 1977 as follows:

| Year | Tax | Penalty | Interest | Lien Fees |
|------|-----|---------|----------|-----------|
| 1973 | $70,787.60 | $3,539.38 | $16,621.99 | $12.00 [1] |
| 1974 | 95,865.62 | 4,793.28 | 16,758.75 | — |

23. Later, because there was some confusion as to whether Mrs. Wodtke had also filed a petition with the Tax Court or whether Mr. Wodtke's petition included Mrs. Wodtke, the Internal Revenue Service abated the taxes assessed against Mrs. Wodtke. This abatement occurred on July 19, 1977.

24. Later, the Internal Revenue Service determined that the petition filed by Mr. Wodtke only covered Mr. Wodtke's liability and not that of Mrs. Wodtke. The Internal Revenue Service then reassessed the taxes against Mrs. Wodtke on August 24, 1977. (Plaintiff's Exh. 4).

25. Mr. Wodtke was accorded a hearing by the Tax Court in Des Moines, Iowa. Mrs. Wodtke, Revenue Agent Mansfield and others were present.

26. By decision dated November 21, 1978 the Tax Court upheld the notice of deficiency. The Eighth Circuit affirmed on appeal in an unpublished opinion. (Plaintiff's Exh. 3).

27. The Internal Revenue Service assessed taxes against Mr. Wodtke on August 10, 1979 for the years 1973 and 1974 as follows:

| Year | Tax | Penalty | Interest | Lien Fees |
|------|-----|---------|----------|-----------|
| 1973 | $70,787.60 | $3,539.38 | $22,545.85 | $12.00 [2] |
| 1974 | 95,865.62 | 4,793.28 | 24,781.27 | — |

(Plaintiff's Exh. 5).

28. The Internal Revenue Service filed notices of federal tax liens against all property and rights to property belonging to the Wodtkes with the Office of the Recorder for Woodbury County. A tax lien was filed with respect to Mrs. Wodtke on February 20, 1980 and against Mr. Wodtke on the same day. A second tax lien was filed with respect to Mr. Wodtke on July 31, 1980 to correct the spelling of his first name.[3]

1. Lien fee assessed February 19, 1980 when lien was prepared.

2. Lien fee assessed February 19, 1980 when lien was prepared.

29. As of July 29, 1985, Mr. Wodtke was indebted to the United States in the amount of $442,625.08. This amount includes the amount of his assessment, plus interest of $101,812.71 for 1973 and $137,601.73 for 1974 together with penalties for each year.

30. As of July 29, 1985, Mrs. Wodtke was indebted to the United States in the amount of $447,031.75. This total includes the amount of her assessment, plus interest of $103,517.77 for 1973 and $139.910.87 for 1974 together with penalties for each year.

31. Interest continues to accrue on the amounts by which the Wodtkes are indebted to the United States at the rate specified by law.

32. On December 7, 1976, Mr. Wodtke executed a "vow of poverty" by which he purported to give all of his present and future possessions and all income to an Order of the Life Science Church called The Order of Almighty God, Alpha Chapter. The gift stated it was irrevocable except provided that all property would revert to the donor if certain events occurred. (Defendants' Exh. B, p. 1).

33. Approximately one year later, on December 27, 1977, Mrs. Wodtke executed a similar "vow." By her vow, Mrs. Wodtke purported to give "all" of her property to The Order of Almighty God 904, Chapter. (Defendants' Exh. B, p. 2).

34. The Wodtkes testified that these various names were all synonyms for the Life Science Church of Oto, Iowa.

35. The Wodtkes each testified that the Church had documents describing its existence and purpose but declined to produce such documents or state where such documents were located. The Court concludes that the Church has never been incorporated.

36. The Wodtkes testified that the Church was run by a board of directors and a number of trustees. However, the Wodtkes declined to name any of these

3. No additional lien fee was assessed on this second tax lien.

individuals. The only names ever appearing on documents relating to the Church are Leonhard and June Wodtke.

37. By two quit claim deeds dated December 31, 1977, the Wodtkes purportedly transferred to themselves as Trustees of the Life Science Church of Oto, Iowa, and the Order of Almighty God, a portion of their 300–acre farm for the recited consideration of $1.00. There was no other consideration for the transfer; therefore, the transaction lacked sufficient consideration. (Plaintiff's Exh. 9, p. 1).

38. By quit claim deed dated September 13, 1978, the remainder of the farm purportedly was transferred to the Church and Order. Again, the deed recited token consideration of $1.00; there was insufficient consideration for the transfer. (Plaintiff's Exh. 9, p. 3).

39. The three deeds affecting title to the farm were recorded in the Woodbury County Recorder's office on September 14, 1978. (Plaintiff's Exh. 9).

40. In August of 1978, Special Agent James Whelan of the Internal Revenue Service attended a seminar in Sioux City. The speaker discussed setting up one's own church and taking a vow of poverty in order to avoid payment of income taxes.

41. Mr. Whelan was present pursuant to an investigation of a third party. By coincidence, he happened to sit next to Mr. Wodtke. At the end of the seminar, Mr. and Mrs. Wodtke encouraged Mr. Whelan to set up his own church and take a vow of poverty in order to avoid payment of federal taxes. Mr. Wodtke represented that he had done those very things in order to avoid payment of taxes.

42. The Wodtkes' residence is located on the farm. They continued to reside there both before and after the purported conveyance to the Church and live there at the present time. Throughout this proceeding, the Wodtkes referred to the property as the "Wodtke farm."

43. Both before and after the purported conveyance to the Church, the Wodtkes and their family made all decisions affecting the farm. These decisions included what to plant, how much of each crop to plant, when to plant, when to harvest and when to sell.

44. After the transfer, the Wodtkes testified that a board of directors controlled the farm. The Wodtkes would not testify who these board of directors were although they did admit that initially they alone controlled the farm.

45. No individuals other than the Wodtkes are identified as having a say in Church affairs. The Court concludes that the Wodtkes have failed to persuade the Court that anyone but themselves operate the farm.

46. Both prior to and after the purported transfer of the farm, the Wodtkes belonged to the National Farmers Organization (NFO), a group that assists farmers in selling their crops. The NFO sells the crops and remits the proceeds to the farmer. Both prior to and after the purported transfer, Leonhard Wodtke continued receiving payment in his own name. This only changed after June Wodtke began working for the NFO in November of 1977. Initially, Mrs. Wodtke, as a signatory on checks written by the NFO, wrote checks payable to Leonhard Wodtke individually. This continued through November of 1979. Thereafter, she wrote checks out to the Life Science Church. (Plaintiff's Exh. 16).

47. Through December of 1977, Mr. Wodtke endorsed the NFO checks in his own name. Thereafter, whether made payable to him or the Church, the checks were endorsed "Life Science Church" except in those instances where the checks were endorsed over to third parties in which case Mr. Wodtke signed his own name. (Plaintiff's Exh. 16).

48. The Wodtkes deposited the NFO checks in a Life Science Church account at Mapleton Trust and Savings Bank. Leonhard and June Wodtke were the only individuals with signature authority on this account. (Plaintiff's Exh. 17).

49. Both prior to and after the conveyance, the Wodtkes controlled the farm and

enjoyed the fruits of their labors. The proceeds of farm crops went to the benefit of the Wodtkes and their family.

50. After the Wodtkes purportedly transferred all of their real and personal property to themselves as Trustees for the Life Science Church, they continued to retain beneficial enjoyment of all the property purportedly transferred.

51. The Wodtkes control all disbursements from the income earned by the farm. They have controlled such disbursements from the time of the purported conveyance until the present.

52. The Wodtkes use funds purportedly belonging to the Church to provide all of their necessities, including food, heat, electricity and clothing. Food and clothing is paid for out of a so-called $100.00 monthly allowance given the Wodtkes from the Church. The Church funds come from funds earned by the Wodtkes in their farming operation.

53. After the purported conveyance to the Church in 1977, Mr. Wodtke applied for and received from at least 1975 to 1981 crop insurance through the Federal Crop Insurance Corporation (FCIC) in his own name. At all times the farm was listed as being owned by Leonhard and June Wodtke. The Wodtkes never notified the FCIC of a change in ownership. Mr. Wodtke made repeated contract changes throughout the years in his own name. On January 17, 1981, the FCIC mailed Mr. Wodtke a check for $1,929.17 for a 1980 crop year loss he suffered. Previously, Mr. Wodtke had failed a claim for indemnity in his own name. (Plaintiff's Exh. 15).

54. Mr. Wodtke also participated in a program sponsored by the Agricultural Stabilization and Conservation Service (ASCS). Under this program, farmers received payments for low yields. Mr. Wodtke submitted crop yield information to the ASCS from 1975 through 1981 although he only participated in the ASCS program in 1980. ASCS records list Leonhard Wodtke as the owner and operator of the farm. In 1981, Mr. Wodtke received a check in his own name for $196.73 from the ASCS because of his low yields for the 1980 crop year. (Plaintiff's Exh. 14).

55. Mr. Wodtke also farmed some property owned by Edna Kloster during pertinent years. Mr. Wodtke paid cash rent for use of the property. ASCS records list Leonhard Wodtke as the operator of this farm but show Edna Kloster as the owner. Because of low yields on this farm, Mr. Wodtke was mailed a check by ASCS for $917.89 in his own name.

56. The Wodtkes claimed and received a homestead exemption in their own names with the county assessor's office through 1981. This resulted in a lower tax bill for each year the exemption was claimed. Although the Wodtkes claim their home and farm is a church and a church exemption would be a total exemption, they had never claimed a church exemption with the assessor's office. (Testimony of Harold Zar).

57. The Wodtkes never notified John Hancock of a change in ownership of the farm. John Hancock sent all notices relating to the mortgage to Leonhard and June Wodtke and continues, through the present, to look to them for payment.

58. On April 20, 1982, the Wodtkes caused to be recorded a purported mortgage in the amount of $375,000.00 from International Trust and Mortgage Ltd., an entity in the British West Indies. (Plaintiff's Exh. 11). The mortgage purportedly encumbered the Wodtkes' farm. Although the Wodtkes signed the mortgage as Trustees of the Life Science Church, they claim to have no knowledge of where the mortgage money has gone or whether the mortgage is being repaid. The Wodtkes stated that the other directors of the Church, whom they refused to name, have knowledge of the mortgage. No appraisal of the property was made prior to the recording of the purported mortgage.

59. The above-mentioned purported mortgage is, based on the evidence, a sham, filed in an attempt to cloud title to the farm and is of no force and effect. It is unlikely that any lender would loan such a large amount without an appraisal and

with tax liens encumbering the property. It is also unlikely that the Wodtkes would not know anything about the mortgage even if one actually had been executed.

60. The purported transfer of the farm and other property occurred at a time when the Wodtkes knew they were facing a significant tax liability for 1973 and 1974.

61. The purported transfer of the farm and other property occurred at a time when the Wodtkes knew they did not file tax returns for 1975 and 1976, even though they had continued to earn income and were liable for federal income taxes. At the time of the purported transfer, the Wodtkes had no intention of filing any future tax returns or paying income taxes.

62. The purported transfer was made for no consideration.

63. Mrs. Wodtke made the purported transfer after she had received the notice of deficiency and after she had been assessed for 1973 and 1974 taxes.

64. Although Mr. Wodtke took his "vow of poverty" prior to receiving the notice of deficiency, the vow did not actually "convey" the real property. The "conveyance", if it occurred at all, took place when the quit claim deeds were executed and filed. The quit claim deeds were filed after the notice of deficiency was sent and after Mr. Wodtke had filed a petition with the Tax Court.

65. The Wodtkes attempted to place all of their assets beyond the reach of the United States by their purported transfer of property to themselves as Trustees of the Life Science Church of Oto, Iowa.

66. The Wodtkes attempted to avoid paying their tax liabilities by the purported transfer.

67. The purported transfer was made with actual intent to hinder, defraud or otherwise delay the United States from collecting taxes owed to it.

68. The Wodtkes purposefully attempted to render themselves insolvent by their purported transfer. The purported transfer left them with little or no assets in their own names. Their remaining assets were insufficient to pay their then existing and anticipated debts.

69. The purported transfer of the Wodtkes' property was fraudulent as to the United States and should be set aside in order to allow the United States to foreclose its tax liens.

70. The purported transfer of the Wodtkes' property is a nullity because both before and after the purported conveyance, the Wodtkes enjoyed the beneficial use of such property and controlled the use of such property.

71. The purported transfer is of no force and effect because the evidence before the Court is persuasive that the Church has no existence separate and apart from the Wodtkes. No competent evidence to the contrary was produced. The Church is the *alter ego* of the Wodtkes. In essence, the Wodtkes conveyed the property to themselves.

## CONCLUSIONS OF LAW

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1340 and 1345 and 26 U.S.C. § 7402.

 Defendants contend that Title 26 is not positive law and therefore this Court has no jurisdiction. Title 1, United States Code, Section 204(a) states:

United States Code.—The matters set forth in the edition of the Code of Laws of the United States current at any time shall, together with the then current supplement, if any, establish prima facie the laws of the United States, general and permanent in their nature ... *provided, however,* That whenever titles of such Code shall have been enacted into positive law, the test thereof shall be legal evidence of the laws therein contained, in all the courts of the United States....

*Id.* (Emphasis in original). If construction of a section of the United States Code which has not been enacted into positive law is necessary, recourse must be had to the original statutes themselves. *United States v. Welden,* 377 U.S. 95, 84 S.Ct.

1082, 12 L.Ed.2d 152 (1964). Under § 204, the United States Code cannot prevail over the statutes at large if the two are inconsistent. *Stephan v. United States*, 319 U.S. 423, 63 S.Ct. 1135, 87 L.Ed. 1490 (1943). The Wodtkes have not identified specific code sections which they challenge. They have not cited a single instance wherein any portion of Title 26 differs from the Internal Revenue Code as passed and amended. The Court therefore rejects defendants' contention that Title 26 is not law.

The Wodtkes contend that the Sixteenth Amendment to the Constitution was not properly ratified. Because the federal income tax laws are derived from the Sixteenth Amendment, the Defendants Wodtke reason that they have no tax liability.

■ The validity of the enactment of a constitutional amendment is not a justiciable issue. It is a political question upon which the courts cannot rule. *Coleman v. Miller*, 307 U.S. 433, 447–451, 59 S.Ct. 972, 979–981, 83 L.Ed. 1385 (1939); *Luther v. Borden*, 48 U.S. (7 How.) 1, 38–39, 12 L.Ed. 581 (1849).

■ The validity of the Sixteenth Amendment was first upheld nearly seventy years ago in *Brushaber v. Union Pacific Railroad Co.*, 240 U.S. 1, 36 S.Ct. 236, 60 L.Ed. 493 (1916). Recent decisions have been no different. *Parker v. Commissioner*, 724 F.2d 469, 471 (5th Cir.1984); *Baker v. Commissioner*, 37 T.C.M. (CCH) 307, 309 (1978) *aff'd without published opinion*, 639 F.2d 787 (9th Cir.1980), *cert. denied*, 451 U.S. 1018, 101 S.Ct. 3008, 69 L.Ed.2d 390 (1981); *Ginter v. Southern*, 611 F.2d 1226, 1229 (8th Cir.1979). The defendants' argument that the Sixteenth Amendment is a nullity is rejected.

■ The Wodtkes have moved to dismiss this civil matter claiming that it is really a criminal case. Part of this case involves an alleged fraudulent conveyance. However, this is a civil fraud, not criminal fraud. *See Rouse v. Rouse*, 174 N.W.2d 660 (Iowa 1970).

This case involves the Wodtkes' tax liabilities for the years 1973 and 1974. There is no possibility of the Wodtkes being prosecuted for a tax offense relating to these years as the statute of limitations for offenses arising under the internal revenue laws has passed. (26 U.S.C. § 6531.) Section 6531 prescribes three-year and six-year periods for certain offenses. The Government has taken the position that the period in which the Government could have sought to indict the Wodtkes for tax offenses occurring in 1973 and 1974 has expired.

■ The Wodtkes have argued that the Government cannot foreclose its tax liens as these liens have expired. This argument is unpersuasive. Section 6321 of the Internal Revenue Code (26 U.S.C.) provides for a lien in favor of the United States against all property and rights to property belonging to a taxpayer. This lien arose at the time the taxes were assessed and continues until the liability is satisfied or becomes unenforceable because of lapse of time. Section 6502(a) provides for a six-year period for tax collection. However, the six-year period is extended if the Government commences suit to reduce the liability to judgment within that period. The suit tolls the statutory period, *United States v. Ettelson*, 159 F.2d 193, 196 (7th Cir.1947), the obtaining of a judgment will keep the time for collection open indefinitely, *United States v. Overman*, 424 F.2d 1142 (9th Cir.1970), and will correspondingly extend the life of the lien. § 6322. The lien is effective against the taxpayer even if not filed. *United States v. Trilling*, 328 F.2d 699, 702 (7th Cir.1964).

■ The Wodtkes referred the Court to § 6323(g) which provides that tax liens must be refiled within six years and one month of the assessment. They then argue that the liens have expired because they were not refiled. Defendants ignore that § 6323 provides for the filing of tax liens in order to protect certain classes of individuals which include purchases, holders of security interests, mechanics liens and judgment lien creditors. § 6323(a).

These terms are defined in § 6323(h). Neither the Wodtkes nor their Church meet the definition of a protected party.

So long as the persons being foreclosed are not one of the enumerated classes, the Government can foreclose its tax liens arising by virtue of § 6321 even if no tax lien was ever filed. *United States v. Trilling, supra.* The § 6321 liens arise by operation of law and continue so long as the period for collection remains open. By filing this suit, the Government has extended the collection period. Thus, the tax liens remain in effect and may be foreclosed if appropriate.

It is true, of course, that because the tax liens were not refiled, a purchaser, holder of a security interest or other enumerated person could acquire priority over the tax lien. Whether such a person could be a bona fide purchaser in the face of the notices of lis pendens filed by the Government is a separate question. Nevertheless, since there are no parties present claiming protected status, further discussion of the point is moot.[4]

The assessment of taxes against Mr. Wodtke was based on a decision by the United States Tax Court and affirmed by the Eighth Circuit Court of Appeals. The liability of Mr. Wodtke is therefore fixed and must be accepted as valid and correct. *Commissioner v. Sunnen,* 333 U.S. 591, 597–602, 68 S.Ct. 715, 719–721, 92 L.Ed. 898 (1948); *United States v. Annis,* 634 F.2d 1270, 1272 (10th Cir.1980); *Russell v. United States,* 592 F.2d 1069, 1071 (9th Cir.1979).

Because Mrs. Wodtke did not petition the Tax Court, she may litigate her tax liability in this case. Mrs. Wodtke moved for a jury trial on this issue but waived her right to a jury prior to trial. The United States agreed to this waiver and accordingly this issue was tried to the Court. Rule 38(d), Federal Rules of Civil Procedure.

▪ An assessment of taxes is presumptively correct. A taxpayer has the burden of proving the assessment is in error and proving his or her correct tax liability. *United States v. Janis,* 428 U.S. 433, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976); *Welch v. Helvering,* 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212 (1933).

▪ Every person who may owe a tax is required to keep records which will enable a correct tax return to be filed. A taxpayer is obligated to make these records available to the Government so that a reported tax liability may be verified. 26 U.S.C. § 6001; *Carr Enterprises, Inc. v. United States,* 698 F.2d 952 (8th Cir.1983); *Lukovsky v. Commissioner,* 692 F.2d 527 (8th Cir.1982). Taxpayers are not exempt from this record-keeping requirement because they are farmers. *See* 26 C.F.R. § 1.6001–1(b).

▪ A taxpayer has the burden of proving his entitlement to a tax deduction. *Burnet v. Houston,* 283 U.S. 223, 51 S.Ct. 413, 75 L.Ed. 991 (1931); *Lukovsky v. Commissioner, supra* at 528.

A tax deduction is a matter of legislative grace. Congress could choose, if it desired, to impose a tax on gross income without allowance of deductions. A taxpayer who claims a deduction has the burden of showing that he is entitled to the deduction and the exact amount of the deduction. *Commissioner v. National Alfalfa Dehydrating & Milling Co.,* 417 U.S. 134, 148–49, 94 S.Ct. 2129, 2136–37, 40 L.Ed.2d 717 (1974); *Interstate Transit Lines v. Commissioner,* 319 U.S. 590, 593, 63 S.Ct. 1279, 1281, 87 L.Ed. 1607 (1943).

▪ Mrs. Wodtke was uncooperative with the audit and failed to provide any proof of the amount of her deductions. Where a taxpayer fails or refuses to provide documentation, the Internal Revenue Service must disallow every deduction taken. Accordingly, the assessment of taxes made against her is valid and correct. *Burnet v. Houston, supra; Oliver v. Commissioner,* 364 F.2d 575 (8th Cir.1966); *Roberts v. Commissioner,* 62 T.C. 834 (1974).

---

**4.** All Motions to Dismiss by the Wodtkes are denied.

■ The abatement of the first tax assessment made against Mrs. Wodtke does not render the subsequent assessment invalid so long as the subsequent assessment was made in a timely manner. *Schildhaus v. Commissioner*, 28 T.C.M. (CCH) 1463, 1475 (1969), *aff'd*, 442 F.2d 1343 (2d Cir. 1971) (*per curiam*).

The statute of limitations for assessing taxes for 1973 normally would have expired on April 15, 1977. However, if a notice of deficiency is issued, the statute of limitations is suspended for 90 days during which time the taxpayer can file a petition with the United States Tax Court. If no petition is filed, the limitation period is extended for an additional sixty days, plus however much time was left remaining between the date of the notice and the original statute of limitations date. 26 U.S.C. § 6503(a); *Ramirez v. United States*, 538 F.2d 888, 210 Ct.Cl. 537 (1976), *cert. denied*, 429 U.S. 1024, 97 S.Ct. 642, 50 L.Ed.2d 625 (1976).

The notice of deficiency was mailed March 21, 1977. For the next 90 days, the Service was precluded from assessing taxes against the Wodtkes. After this 90–day period expires, the Service has 60 days, plus whatever time was left on the three-year limitation period. Because the notice of deficiency was mailed 25 days prior to April 15, 1977, the Service had 90 days, plus 60 days, plus 25 days to assess Mrs. Wodtke for 1973 taxes.

The assessment of taxes made against Mrs. Wodtke on August 24, 1977 was made in a timely manner. Taxes for 1973 could have been assessed against her through September 12, 1977. *Ramirez v. United States, supra;* 26 C.F.R. § 301.6503(a)–1(a)(2).

As of July 29, 1985, Mrs. Wodtke was indebted to the United States for federal income taxes, interest, penalties and lien fees in the amount of $182,495.57 for 1973 and $264,536.18 for 1974. Interest continues to accrue on those amounts at the rate specified in 26 U.S.C. § 6621, compounded daily only on those amounts accruing after December 31, 1982. (§ 6622.)

As of July 29, 1985, Mr. Wodtke was indebted to the United States for federal income taxes, interest, penalties and lien fees in the amount of $180,398.84 for 1973 and $262,227.04 for 1974. Interest continues to accrue on these amounts at the rate specified in 26 U.S.C. § 6621, compounded daily only on interest accruing after December 31, 1982. § 6622.

As of the dates of the assessments against Mr. and Mrs. Wodtke, tax liens arose against all of their property and interests in property. 26 U.S.C. § 6322.

■ The vows of poverty taken by the Wodtkes were not sufficient to transfer their real property under Iowa law since the purported vows contained no description of the land affected. Iowa Code § 558.19; *Leighton v. Leighton*, 196 Iowa 1191, 194 N.W. 276, 282 (1923).

The purported conveyance of the farm from the Wodtkes to themselves as Trustees of Life Science Church of Oto, Iowa, by quit claim deeds recorded on September 14, 1978 was subject to the tax lien against Mrs. Wodtke which arose on August 24, 1977, the date of her tax assessment. 26 U.S.C. § 6323(a) and (h)(6); *District Divine Science Church of Allen County v. United States*, 80–1 U.S.T.C., ¶ 9119 (N.D.Ind. Dec. 4, 1979).

The Life Science Church of Oto, Iowa held all property purportedly transferred from the Wodtkes as their nominee. From its inception, the Church has been the *alter ego* of Leonhard and June Wodtke; the evidence failed to demonstrate that it has any existence separate and apart from the Wodtkes. Therefore, the real and personal property purportedly transferred remained subject to federal tax liens against the Wodtkes and could be levied on to satisfy the Defendant Wodtkes' tax liabilities. *Loving Savior Church v. United States*, 728 F.2d 1085 (8th Cir.1984).

■ "Unbridled discretionary powers in a trustee negative the existence of a trust relationship." *Hansen v. Birmingham*, 92 F.Supp. 33, 42 (N.D.Iowa 1950). The purported transfers of property from the Wodtkes to themselves as Trustees of the

Life Science Church of Oto, Iowa were ineffective to transfer ownership, since the grantors also were trustees of the property and retained beneficial interest to the property and unrestricted control of the assets.

Chapter 504A of the Iowa Code contains the Iowa Nonprofit Corporation Act. The Act permits nonprofit organizations, including religious organizations, to be incorporated under its terms. To comply with the Act, an organization must perform certain acts which include adopting bylaws and adopting articles of incorporation which must be filed with the Secretary of State. A qualifying nonprofit corporation may sue and be sued and can own and receive property. Iowa Code §§ 504A.4.2, 504A.4.4. The Life Science Church of Oto, Iowa is an unincorporated organization which has not complied with the requirements of the Act.

Iowa law does not require that religious organization comply with the Nonprofit Corporation Act. However, a religious organization that does not incorporate has no legal existence, can neither sue nor be sued and cannot hold property in its own name. Iowa Code ch. 504A; *Presbyterian Church of Osceola v. Harken,* 177 Iowa 195, 158 N.W. 692, 694 (1916). Because the Life Science Church of Oto, Iowa has no legal existence, the purported transfer of real and personal property to it by the Wodtkes did not transfer title. Title to all the purportedly transferred property remains with the Wodtkes.

In summary, the purported transfers of real and personal property by the Wodtkes were fraudulent as to the United States. The transfers were made with knowledge of their outstanding tax liabilities and in an attempt to avoid the payment of such taxes. The transfers were made in an attempt to leave themselves with no assets to pay their present and future tax liabilities. The purported transfers were without consideration and the Wodtkes retained possession, control and full use of the property purportedly transferred. *Rouse v. Rouse,* 174 N.W.2d 660, 667 (1970).

The tax liens of the United States are prior to all other interests in the property with the exception of the outstanding balance of the mortgage and other fees owed to John Hancock.[5]

The farm shall be sold by an officer of the Court with proceeds first being applied to costs of sale and thereafter to John Hancock in the total amount of the Wodtkes' indebtedness to it and thereafter to the United States in satisfaction of the tax liabilities of the Wodtkes. Excess proceeds, if any, shall be paid to the Wodtkes.

Because the Court determines that the conveyance of the property to the church was ineffective and the Wodtkes have had the beneficial use of the farmland from which they earn income, there is no evidence of pauper status. The Court taxes costs of this action to the Defendant Wodtkes.

Accordingly,

IT IS ORDERED that the Government shall prepare a judgment consistent with this Memorandum Decision and Order with updated tax liability figures for Leonhard and June Wodtke to be filed effective January 15, 1986.

---

**5.** The matter of Hancock's entitlement to other fees will be addressed in a later order only if it is shown that resolution of that matter is necessary to clear title and there is a dispute concerning them.