**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

JACK KENT COOKE INCORPORATED,
Plaintiff-Appellant,

v.                                                      No. 96-2596

UNITED STATES OF AMERICA,
Defendant-Appellee.

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Claude M. Hilton, District Judge.
(CA-95-1747-A)

Argued: May 5, 1997

Decided: June 26, 1997

Before WILKINS, Circuit Judge,
Joseph F. ANDERSON, Jr., United States District Judge for the
District of South Carolina, sitting by designation,
and TRAXLER, United States District Judge for the
District of South Carolina, sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Bernard J. Long, Jr., DOW, LOHNES & ALBERTSON,
P.L.L.C., Washington, D.C., for Appellant. Teresa Ellen McLaughlin,
Tax Division, UNITED STATES DEPARTMENT OF JUSTICE,
Washington, D.C., for Appellee. **ON BRIEF:** James A. Treanor, III,

J. Clark Armitage, DOW, LOHNES & ALBERTSON, P.L.L.C., Washington, D.C., for Appellant. LORETTA C. ARGRETT, Assistant Attorney General, Andrea R. Tebbetts, Helen F. Fahey, United States Attorney, Tax Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

This is an appeal from a decision of the district court granting summary judgment to the United States in a taxpayer refund action. The dispute arises out of a 1984 purchase of a horse farm by the appellant, Jack Kent Cooke Incorporated ("Cooke"). For the reasons that follow, we affirm.

Cooke is the common parent of an affiliated group of corporations whose activities include, among other things, the racing and breeding of thoroughbred horses. In 1984, Cooke purchased certain property from the estate of Maxwell H. Gluck known collectively as the "Equine Holdings," consisting of 353 horses, certain motor vehicles, and other personal property. At the same time, Cooke purchased all shares of Elmendorf Farm, Inc. ("EFI") from the Gluck Estate. The assets of EFI consisted primarily of land and improvements used as a horse breeding farm and racing stables. The sale of these assets was consummated on December 28, 1984. At the time of the closing, Cooke incorrectly assumed that all of the assets being acquired were owned by the Gluck Estate indirectly through EFI. In fact, the Equine Holdings were owned directly by the Gluck Estate.

In early January 1985, Wanda Wiser, Cooke's controller during the relevant time period, learned for the first time that the Equine Holdings had been owned directly by Maxwell Gluck, rather than as a part

2

of EFI. Wiser recommended to Cooke's president, Jack Kent Cooke, that the Equine Holdings be combined with Cooke's existing horse racing and breeding operations in a single corporate entity. EFI was selected for that purpose because it already owned the real property to be used in the business.

Wiser further recommended that the Equine Holdings be treated "for internal bookkeeping purposes, as having been transferred to EFI as of the December 28, 1984 closing date of their purchase by [taxpayer]." In mid-January 1985,[1] Cooke's board of directors signed, and backdated to December 28, 1984, a unanimous resolution channeling the Equine Holdings into EFI. Cooke's 1984 tax return reported that EFI acquired the Equine Holdings on December 28, 1984. Wiser explained that the resolution was backdated "to make this transaction effective December 28, 1984 so that we can start our books out fresh with all the horses and assets and everything in the one corporation and not over in [Cooke]." Cooke's treatment of its horse operations on its 1984 consolidated federal income tax return was consistent with its treatment on the corporate books. That is to say, the return did not reflect that the Equine Holdings were ever a part of Cooke's assets. Rather, the accompanying depreciation schedules indicated that EFI acquired the Equine Holdings in 1984 and incurred corresponding depreciation expense in the amount of $6,491,806.00. As a result of the depreciation claim, Cooke reported a consolidated net operating loss for all its operations in the amount of $5,336,104.00, which it carried back and claimed as a deduction on an amended return for the taxable year 1981. Cooke thereafter received a refund of its 1981 taxes in the amount of $2,309,257.00.

In 1988, the Internal Revenue Service ("I.R.S.") began an examination of Cooke's consolidated returns for the years 1984 through 1987. The I.R.S. concluded that Cooke was entitled to only one twelfth of the claimed depreciation deduction with respect to the Equine Holdings. The I.R.S. found that Cooke did not place Equine Holdings in service before transferring them to EFI and that EFI had a short tax-

_____

[1] The date that this resolution was actually adopted has been the subject of some confusion in the briefs and at oral argument. For purposes of this appeal, it is sufficient for the court to conclude that the board took this action sometime in early to mid-January.

able year extending from December 29, 1984 to December 31, 1984.**2** The Commissioner accordingly disallowed eleven twelfths of the claimed deduction. As a result of this and other adjustments, the net operating loss carried back to 1981 was eliminated and the Commissioner determined that Cooke was liable for a deficiency in the amount of $2,309,273.00 in its 1981 tax.

Cooke paid the deficiency, filed a timely claim for a refund, and then initiated this action. On cross motions for summary judgment, the district court found that Cooke decided to have EFI, not Cooke, place the Equine Holdings in service in 1984 and that EFI was entitled to only one month's depreciation for 1984 because of its short taxable year. Taxpayer now appeals to this court.

Because the case below is decided on summary judgment, the standard for review of the district court's order is de novo. United States v. National Fin. Servs. Co., 98 F.3d 131 (4th Cir. 1996).

Depreciation deductions are available to a taxpayer who "uses" personal property in a trade or business. 26 U.S.C.A.§ 167(a) (West Supp. 1997). Under regulations in effect in 1984, a taxpayer uses property when the property is "placed in service" by the taxpayer. Treas. Reg. §§ 1.167(a)-10(b), 11(e)(1)(1984). Cooke argues that it placed the horses in service during 1984 and should therefore be allowed to claim the deduction for these horses for the full 1984 tax year. The government's position is that EFI, rather than Cooke, placed the Equine Holdings in service, because the transfer to EFI had been made effective the same day that the assets were purchased, all expenses for the horses (except for the purchase price) had been borne by EFI, the income from the assets was attributed to EFI, and the assets were listed as depreciable assets of EFI.

At issue here is not the question of whether the Equine Holdings were placed in service in 1984. The issue is who placed the Equine Holdings in service, EFI or Cooke or both? Cooke advances two alternative arguments in support of its claim that it placed the horses in service during the 1984 tax year.

_____

**2** The I.R.S. determined, and the parties do not dispute, that EFI had a short taxable year beginning on December 29, 1984.

4

First, Cooke suggests that the court should disregard the information reported on its tax return and instead look to what actually occurred. There is no question that Cooke, not EFI, originally purchased the Equine Holdings on December 28, 1984. In mid-January of 1985, Cooke's board of directors transferred the Equine Holdings to EFI and backdated the effective date of the transfer to December 28, 1984. Cooke thus argues that the "real" transfer date of mid-January 1985, should be used by the court for determining whether the horses were placed in service by Cooke in 1984. As the district court correctly recognized, however, it is fundamental that "while a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the consequences of his choice . . . and may not enjoy the benefit of some other route he might have chosen to follow but did not." Commissioner v. Nat'l. Alfalfa Dehydrating and Milling Co., 417 U.S. 134 (1974).

In essence, Cooke seeks to repudiate both its book entries and its sworn tax return as nothing more than the product of a convenient accounting device that does not reflect the substance of the transactions in issue. Although the government may disregard the form of a sham or unreal transaction, taxpayers may not set up straw men and then blow them down when no longer convenient. See Television Indus., Inc. v. Commissioner, 284 F.2d 322, 325 (2d Cir. 1960) ("It would be quite intolerable to pyramid the existing complexities of the tax law by a rule that the tax shall be that resulting from the form of transaction taxpayers have chosen or from any other form they might have chosen, whichever is less."); Maletis v. United States, 200 F.2d 97 (9th Cir. 1952) ("If it is in fact unreal, then it is not [the taxpayer] but the Commissioner who should have the sole power to sustain or disregard the effect of the fiction since otherwise the opportunities for manipulation of taxes are practically unchecked."). The district court did not err in holding that Cooke is bound by its representation that the Equine Holdings were transferred to EFI on December 28, 1984.

Cooke's alternative position assumes, arguendo , that the December 28, 1984 transfer date reported in its tax return is binding. Cooke assumes that the Equine Holdings were transferred on December 28, 1984 from the Gluck Estate to taxpayer and then, on that same day, were transferred from taxpayer to EFI. Cooke contends, however, that the fleeting moments during which it held title to the Equine Holdings

5

as they passed through on the way to EFI meet the placement in service requirement. Cooke suggests that Section 167 requires no minimum holding period for an asset to be considered placed into service.

Cooke is correct in its argument that Section 167 has no minimum holding period per se. All that Section 167 requires is for the owner to place the asset "in a condition or state of readiness and availability for a specifically assigned function." Treas. Reg. § 1.167(a)-11(e)(1) (1984). The length of time that a taxpayer holds ownership is not determinative of the issue, but it may be evidence of whether the taxpayer placed the property in service. According to its tax return, Cooke was a mere conduit for the transfer of the Equine Holdings from the Gluck Estate to EFI. Under these circumstances, the court cannot conclude that the district judge erred in determining that Cooke did not place the Equine Holdings in service for purposes of Section 167.

There is yet another reason to affirm the district court. The record is clear that until early January, Cooke incorrectly believed that the Equine Holdings were already owned directly by EFI. **3** In other words, if the court were to look through the paper trail established by the parties to the true intent of the taxpayer, it is clear that Cooke never intended to directly own the horses. As soon as Cooke discovered that it did, in fact, directly own them, the horses were transferred to EFI under an arrangement that backdated the transaction to the date of Cooke's initial acquisition. Cooke cannot now be heard to argue that it placed the Equine Holdings in service during the time that it unknowingly owned them. In short, Cooke's lack of knowledge regarding its direct ownership is further evidence that it never placed the Equine Holdings in service.

As an alternative position, Cooke asserts that the transfer of the Equine Holdings to EFI was an exchange within the meaning of Sec-

_____

**3** Wiser testified that in early January she learned for the first time that the Gluck Estate had directly owned the horses. (A. 48, 171-72, 179, 192-94). She stated that she had initially thought everything was owned by EFI. Id. Wiser further testified that when she asked taxpayer's president, Jack Kent Cooke, if the horses should be consolidated under EFI, he stated, "[O]f course, isn't that the way it is?" (A. 179).

6

tion 351 of the Internal Revenue Code, which precludes recognition of gain or loss where property is transferred to a corporation solely in exchange for property of that corporation and immediately thereafter the transferror is in control of the transferee. 26 U.S.C. §§ 351 (West Supp. 1997). The government does not dispute that the taxpayer's transfer of the Equine Holdings to EFI came within the ambit of Section 351. This section merely precludes the recognition of gain or loss and, as the government points out, there has been no recognition of gain or loss by the taxpayer or EFI on any portion of the value of the taxpayer's transfer of the Equine Holdings. That is all that Section 351 requires.

Cooke also asserts that former Section 168(F)(10) of the Code supports its position. 26 U.S.C.A. § 168(F)(10) (West 1984). However, Section 168(F)(10) merely allowed a transferee to step into the shoes of a transferror in certain instances. It did not change the fact that here the transferror, Cooke, never placed the Equine Holdings in service.

For the above stated reasons, the decision of the district court is hereby affirmed.

AFFIRMED