**Jerome LINDBERG, Personal Representative of the Estate of Temple H. Buell, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civil Action No. 94–M–2435.**

United States District Court,
D. Colorado.

June 13, 1996.

Stanton D. Rosenbaum, Gary A. Kleiman, Isaacson, Rosenbaum, Woods & Levy, P.C., Denver, CO, John D. Moats, Drexler Wald & Moats, Englewood, CO, for plaintiff.

William Pharo, Assistant United States Attorney, Philip E. Blondon, Trial Attorney, Tax Division, Washington, D.C., for defendant.

## MEMORANDUM OPINION AND ORDER

MATSCH, Chief Judge.

This is an action by the Estate of Temple H. Buell (Estate), through its Personal Representative, Jerome Lindberg, for a refund of estate taxes. This court has jurisdiction over the matter pursuant to 28 U.S.C. § 1346. The relevant facts have been stipulated and the case was submitted on cross motions for summary judgment after arguments were heard on April 11, 1996.

Temple H. Buell (Buell) died testate on January 5, 1990. Most of his assets had been put into trusts. The Temple H. Buell Trust (Buell Trust) was a revocable inter vivos trust holding 90% of the stock of Buell Development Corporation (BDC), marketable securities worth something less than $1,000,000, and a jade and ivory collection valued at about $1,500,000. BDC is a real estate development and management company. The Cherry Hills Trust was a revocable trust holding title to 125 acres of land in Cherry Hills Village and stock in the Tejon Ranch Company. The Buell Family Trust (Family Trust) was established in 1988 primarily to provide income to Buell's eleven grandchildren beginning 10 years after Buell's death and continuing for 10 more years, with the corpus to be distributed to them at the end of that period. The Family Trust held approximately $1,200,000 in municipal bonds. The income from the Family Trust was to go to the Buell Foundation (Foundation) during the first ten years following Buell's death. The Foundation was established in 1962 as a non-profit organization making annual grants to charitable organizations. In 1985 the Foundation owned 10% of BDC and had aggregate assets worth approximately $3,000,000. In 1986 the Foundation received ownership of Cherry Creek Shopping Center, valued at $15,000,000, from BDC.

Buell established the Buell Trust in 1972. The Twelfth Amendment to Trust Agreement (Trust Agreement) was executed on April 27, 1988. Buell named himself and Harold E. Williamson (Williamson) as joint trustees. The Trust Agreement provided income to Buell during his life and permitted charitable contributions at the discretion of the trustees. The Trust Agreement also provided that upon Buell's death the bulk of the assets, including the jade and ivory collection, would be distributed to the Foundation after payment of obligations, expenses, and

taxes. In addition, the Trust Agreement provided for the funding of the Family Trust to a total net value of $1.2 million.

Buell executed the Cherry Hills Trust agreement on January 13, 1989. It also provided Buell an income for life, and upon his death, the corpus was to be distributed to the Cherry Hills Arts and Culture Center. If that organization was not then in existence or was not a tax-exempt organization, the entire Cherry Hills Trust estate was to be distributed to the Foundation.

Buell's will (Will) was executed on June 8, 1988. He left the entire residue of his estate to the trustee of the Buell Trust. The Will provided a contingent disposition directly to the Foundation if the Buell Trust Agreement failed for any reason, and if the contingent disposition to the Foundation failed for any reason, the residuary assets were to be donated to charity at the discretion of the personal representative of the Estate. Buell explicitly excluded his children from any inheritance in the Will. Buell had four children by his first wife, Marjorie McIntosh Buell, whom he divorced in 1955. He agreed to and did fund a trust for the benefit of his grandchildren as part of the divorce settlement.

Buell's children and grandchildren (collectively, "Descendants") retained attorneys to prepare litigation of eight claims for relief against Buell, Williamson, the Foundation, and BDC as follows:

1. [Buell] represented to certain members of the Buell Descendants the ability of the Foundation to provide adequate means of support for such Buell Descendants during their lifetimes, which representations such Buell Descendants relied on to their detriment.

2. [Buell] misrepresented to the Buell Descendants his intentions with respect to lifetime and testamentary dispositions for the benefit of the Buell Descendants.

3. During his life, [Buell] entered into agreements or contractual arrangements with certain members of the Buell Descendants to provide for them following his death, and failed to comply with such arrangements to the detriment of the Buell Descendants.

4. [Buell] would have provided differently for the Buell Descendants in the Will and Trusts or otherwise during his life had he not been subject to certain mistakes of fact.

5. Certain Trustees or other representatives of the Foundation interfered with or otherwise interceded with efforts by [Buell] to modify or amend his Will or Trusts or to provide additional assets to the Buell Descendants during his lifetime.

6. The Trustee, trustees and/or other representatives of the Foundation, acting in their capacity [sic] as officers, directors, or other representatives of BDC influenced or otherwise caused [Buell] to transfer assets from BDC to the Foundation and/or Trusts rather than to members of the Buell Descendants.

7. [Buell] lacked the requisite capacity to execute the Will, create or amend the Trusts, or transfer certain assets during his life to the Trusts or Foundation or to transfer assets to the Trusts or Foundation as an agent of BDC.

8. [Buell] failed to comply with the terms of the decrees entered in the Court proceedings relating to the divorce of [Buell] and Marjorie McIntosh Buell.

Settlement Agreement and Release of July 29, 1991 at 2–3, Plaintiff's Exhibit E. Williamson and the other representatives of the Foundation and BDC were most concerned that the claims of tortious interference with inheritance and undue influence were the Descendants' strongest claims, although they denied that any of the claims had merit.

The attorneys for the Descendants began discussions of these claims with Richard Greengard, counsel for Buell, the Trusts, the Foundation, and BDC. Following Buell's death these discussions continued with Stan Rosenbaum and Gary Kleiman, special counsel for Williamson, individually, and in his capacity as trustee of the Trusts, President of BDC, and Executive Director and Trustee of the Foundation. After 18 months of negotiations, the parties signed a Settlement Agreement and Release (Settlement) dated July 29, 1991. It provided for the dissolution of the Family Trust and the payment of $2,270,000 to Buell's three living children and

to the children of his deceased son. In return for this and other consideration, the Descendants agreed to forego all claims against Williamson, the Trusts, the Foundation, and BDC. Williamson stated in his deposition that he, the Foundation, and BDC agreed to the Settlement to avoid the costs of litigation. The Settlement was approved by the District Court for Arapahoe County, Colorado in case # 91PR405 at a hearing held on July 31, 1991.

The Estate filed federal estate tax return Form 706 dated April 5, 1991 reporting a gross estate value of $16,934,101 and a taxable estate value of $430,000. The $2,270,000 paid as part of the Settlement with the Descendants was claimed as a deduction on Schedule K of the return as payment of a claim against the estate permitted under 26 U.S.C. § 2053. The Internal Revenue Service (IRS) disallowed the deduction and assessed a tax deficiency of $2,167,080 with associated interest of $671,608 on February 7, 1994. The Estate paid the additional tax and interest in full and filed Form 843 on April 20, 1994 seeking a refund of the payment. On August 8, 1994 the IRS denied the refund claim.

The Estate filed this suit on October 25, 1994 alleging that the disallowance of the refund claim was erroneous. It advances two theories in support of this claim. The first theory is that the Settlement payment was deductible both as a claim against the estate under 26 U.S.C. § 2053(a)(3) and as an administrative expense under § 2053(a)(2). The second theory is that the Settlement payment is deductible under § 2055 as a transfer for charitable uses. The Estate originally advanced a third theory that the value of the gross estate for federal tax purposes should have been reduced by the amount of the Settlement payment as a result of a constructive trust asserted by the Descendants. It withdrew that theory at oral argument.

*I. Deduction as a Claim Against the Estate*

■ The pertinent question for the Estate's attempt to deduct the Settlement payment pursuant to 26 U.S.C. § 2053(a)(3) is whether the payment represents a deductible claim by a creditor "against the estate" or a non-deductible claim by a descendant for a "portion of the estate." This section of the code permits reduction of the value of the taxable estate by the amount paid for claims against the estate. It is intended to allow deductions for payments of claims made by creditors which reduce the value of the estate being distributed. Transfers serving a donative intent or because of disputes between distributees over their respective interests are not deductible. *Bank of New York v. United States*, 526 F.2d 1012 (3d Cir.1975); *Estate of Lazar v. Commissioner*, 58 T.C. 543, 1972 WL 2476 (1972). In attempting to distinguish deductible from non-deductible claims under this section,

> courts look beneath the surface of transactions to discover the essential character of each transfer. Even where a claim is ultimately satisfied by the operation of law, the courts will determine the nature of the claim for federal tax purposes by examining the particular status of the claimant that enabled him to impose his claim on the estate.

526 F.2d at 1017.

The Estate asserts that the $2.27 million payment to the descendants to settle their tortious interference allegation against Williamson and other representatives of the Foundation is properly considered payment of a "claim against the estate." The tort of interference with inheritance requires proof that the defendant (1) intentionally interfered with the rightful legacy of the plaintiff, (2) by unlawful means, which (3) resulted in damages. *Peffer v. Bennett*, 523 F.2d 1323, 1325 (10th Cir.1975). Fraud, duress, and undue influence comprise "unlawful means" which, in Colorado, are also grounds for a descendant to challenge the validity of a testamentary disposition. *Id.* at 1325–26.

Proof of the unlawful means element of tortious interference is necessarily proof which would void the pertinent provisions of a will. Therefore, a tortious interference claim will usually arise out of a will contest, like it did in *Peffer*. The difference is that, normally, the source of payment in a will contest is from the assets of the deceased, and the tortious interference judgment is against the assets of the tortfeasor. In this case, that difference does not exist because

the settlement payment was made from assets of the estate. Although a descendant can bring the tort of interference with inheritance without directly challenging a testamentary disposition, the underlying basis of the claim is the descendant's dispute as to the manner in which his or her ancestor's estate is distributed. A party's standing to bring the tort is based exclusively on his or her status as a descendant of the testator, and the damages alleged are loss of his or her fair share of the estate.

Treasury regulations permit the deduction of tort payments as claims against the estate under certain circumstances.

> The amounts that may be deducted as claims against a decedent's estate are such only as represent personal obligations of the decedent existing at the time of his death, whether or not then matured, and interest thereon which had accrued at the time of death.... Except as otherwise provided in § 20.2053–5 with respect to pledges or subscriptions, section 2053(c)(1)(A) provides that the allowance of a deduction for a claim founded upon a promise or agreement is limited to the extent that the liability was contracted bona fide and for an adequate and full consideration in money or money's worth.... Liabilities imposed by law or arising out of torts are deductible.

26 C.F.R. § 20.2053–4. Tortious interference with inheritance, however, is not deductible under this regulation because it does not represent a personal obligation of the decedent existing at the time of his death. The Descendants' allegation of tortious interference with inheritance was not against Buell, nor could it have been. It was against the Foundation through its representatives, including Williamson in his capacity as its trustee.

In this case the claim of tortious interference with inheritance was not a claim against the estate for purposes of the federal estate tax. It was a claim by the Descendants for a portion of the estate. The $2.27 million Settlement payment was made in consideration for the release of the Descendants' claims for a greater share of the Estate. This payment was not made to a creditor in satisfaction of a personal obligation of Buell existing at the time of his death as required by 26 C.F.R.

§ 20.2053–4. Accordingly, it may not be deducted as payment of a claim against the estate.

The Estate admitted in its briefs that a settlement of a will contest claim would not be deductible as a claim against the estate. It asserts, however, that it seriously considered only the Descendants' tort claim in negotiating the Settlement. It argues that the tort did represent a personal obligation of Buell existing at the time of his death because Buell would have had to indemnify Williamson, who allegedly committed the tort in the performance of his fiduciary responsibility as trustee of the Buell Trusts. Therefore, the payment is deductible. This argument is unavailing.

The record shows that the Descendants were unhappy that all of the Estate assets other than the Family Trust were to be distributed to the Foundation and the Cherry Hills Arts and Culture Center. The Descendants were contesting this plan of distribution as set forth in the Will and Trust Agreement. They alleged that undue influence was the unlawful means that Williamson and other representatives of the Foundation tortiously used to deprive them of their expected legacies.

Any liability for tortious interference would not have been a personal obligation of Buell or his estate. Williamson could not have obtained indemnification from the Buell Trust because he was threatened with suit in his capacity as trustee of the Foundation, not as trustee of the trusts that comprised the Estate. Furthermore, an intentional tort cannot be considered a normal incident of the kind of activity in which a trustee is properly engaged. There is no indemnification available to a trustee who commits an intentional tort unless the tort benefits the estate. George T. Bogert, Trusts, § 130, at 468 (6th ed. 1987). This alleged tort could not benefit the Estate because it could not increase the value of the property held in trust. According to the terms of the Trust Agreement, the net assets of the Buell Trust were to be distributed to the Foundation upon Buell's death. Any tortious interference committed by Williamson would have inured to the benefit of the Foundation. Any intentional in-

terference with the Descendants' inheritance merely altered the distribution of a portion of the trust property upon Buell's death from one distributee, the Descendants, to another, the Foundation.

## II. *Deduction as an Expense of Administration*

■ Alternatively, the Estate seeks to deduct the $2.27 million payment by construing it as an expense of administration to avoid the attorneys' fees that would have been incurred if the Descendants' claims had gone to trial. 26 U.S.C. § 2053(a)(2). Title 26 C.F.R. § 20.2053–3 specifies what may be deducted as an administrative expense:

> The amounts deductible from a decedent's gross estate as "administration expenses" ... are limited to such expenses as are actually and necessarily, incurred in the administration of the decedent's estate; that is, in the collection of assets, payment of debts, and distribution of property to the person entitled to it. The expenses contemplated in the law are such only as attend the settlement of an estate and the transfer of the property of the estate to individual beneficiaries or to a trustee, whether the trustee is the executor or some other person. *Expenditures not essential to the proper settlement of the estate, but incurred for the individual benefit of the heirs, legatees, or devisees, may not be taken as deductions.* Administration expenses include ... attorney's fees....

(Emphasis added). The $2.27 million was paid to the Descendants as consideration for the release of their claims. Although substantial attorneys' fees would have been incurred by the Foundation, BDC, and their representatives in litigating the Descendants' claims, those fees would have been incurred to protect the value of the distribution that they expected to receive from the Estate, not to protect the Estate from depletion. As explained above, the payment did not represent a debt of the decedent existing at the time of his death. Rather, the Settlement payment was an expenditure "incurred for the individual benefit of the heirs, legatees, or devisees." Therefore, the Settlement payment is not deductible as an administrative expense.

## III. *Deduction Pursuant to 26 U.S.C. § 2055*

■ As an alternative theory of deduction, the Estate asserts that payment of the Settlement was for the benefit of the Foundation which is a non-profit, tax-exempt organization. This theory is based on the following rationale: The Foundation was the beneficiary of all of the Estate assets under the terms of the Will and Trust Agreement. The Settlement permitted the Foundation to operate without interruption free of the expense of litigation. This, in turn, left the Foundation with more time and money to devote to charitable purposes. In this way, the Estate contends, the Settlement payment functioned as a tax-deductible charitable contribution pursuant to § 2055.

The Settlement payment is not deductible as a charitable contribution. Regardless of whether the Estate paid the Settlement amount to the Descendants or poured its assets over into the Foundation as per the Trust Agreement so that the Foundation paid the Descendants, the net worth of the Foundation would be $2.27 million less as a result. No value was added to the Foundation as a result of the Settlement payment from the corpus of the Estate, so there was no charitable contribution. The putative savings in time and money that might have been expended in litigation is too uncertain to be credited.

■ Even if a savings in time and money had been shown, it is a well-established tax principle that "a transaction is to be given its tax effect in accord with what actually occurred and not in accord with what might have occurred." *Commissioner v. Nat. Alfalfa Dehydrating & Milling Co.,* 417 U.S. 134, 148, 94 S.Ct. 2129, 2137, 40 L.Ed.2d 717 (1974). The form of a taxpayer's transactions governs the tax ramifications of those transactions. *Goatcher v. United States,* 944 F.2d 747, 752 (10th Cir.1991). A taxpayer is not free to reconstruct or recharacterize a transaction merely because of the discovery that an alternative form would have resulted in more beneficial tax treatment. *Nat. Alfalfa Dehydrating,* 417 U.S. at 149, 94 S.Ct. at 2137. Therefore, the Estate's retroactive re-

characterization of the Settlement payment as a charitable contribution fails.

The Settlement payment was made to and for the use of the Descendants. They are not charitable entities as defined in § 2055. It does not matter that the Settlement may have saved the Foundation great expense by avoiding the costs of litigation. The Estate filed its claim for deduction on Schedule K as a debt of the decedent in the form of a claim against the estate. The Estate may not secure a refund now on a theory of charitable contribution. Upon the foregoing, it is

ORDERED that the plaintiff's motion for summary judgment is DENIED, the defendant's motion for summary judgment is GRANTED, and the clerk will enter judgment for the defendant, dismissing this civil action and awarding costs to the defendant.