PUBLISH

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JAN 13 1999**

**PATRICK FISHER**
**Clerk**

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

JEROME LINDBERG, Personal
Representative of the Estate of
TEMPLE H. BUELL,

       Plaintiff - Appellant,

v.

UNITED STATES OF AMERICA,

       Defendant - Appellee.

**Nos. 96-1403 & 96-1472**

---

## APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
## (D.C. NO. 94-M-2435)

---

Blain David Myhre (Stanton D. Rosenbaum and Gary A. Kleiman with him on the
briefs), Isaacson, Rosenbaum, Woods & Levy, Denver, Colorado, for Plaintiff-
Appellant.

Teresa T. Milton, United States Department of Justice, Tax Division, Washington,
D.C. (Loretta C. Argrett, Assistant Attorney General, Washington, D.C., David I.
Pincus, United States Department of Justice, Tax Division, Washington, D.C., and
Henry L. Solano, United States Attorney, Denver, Colorado, with her on the
briefs), for Defendant-Appellee.

---

Before **ANDERSON** , **KELLY** , and **LUCERO** , Circuit Judges.

---

**ANDERSON** , Circuit Judge.

The Estate of Temple H. Buell ("the Estate"), through its personal representative Jerome Lindberg, appeals the judgment of the district court denying its claim for a refund of federal estate taxes. The Estate argues that it is entitled to a deduction for payments of $2.27 million made to settle Buell's descendants' tort claims for interference with inheritance. It presents three alternative theories for its deduction: (1) the payments settled "claims against the estate" under I.R.C. § 2053(a)(3); (2) the payments were an administrative expense under I.R.C. § 2053(a)(2); or (3) the payments were a charitable contribution under I.R.C. § 2055(a)(2). The district court rejected each of these arguments. It determined first that Buell had no personal liability for the tort claims during his lifetime, and therefore they were not claims against the Estate. The court reasoned that they were in essence claims to inheritances brought by potential heirs; furthermore, they sought compensation from a tortfeasor whom Buell and the Estate had no duty to indemnify. Second, it held that the settlement payment was not an administrative expense incurred in distributing estate property, because it was made for the benefit of individual heirs. Third, it determined that the settlement was not a charitable contribution because it was actually paid to private individuals, and because any benefit to charity was speculative. For the reasons stated below, we largely agree with the district court.

The Estate also disputes the denial of its Motion for Relief or Modification of Judgment, arguing that after judgment the district court improperly refused to hear evidence on various subsidiary issues relating to interest paid by the Estate. We hold that the district court did not abuse its discretion in refusing to hear arguments the Estate had not previously raised.

Accordingly, we affirm the district court's grant of summary judgment and its denial of the Estate's motion for relief or modification.

## I. BACKGROUND

On January 5, 1990, Temple H. Buell died testate. In the decades preceding his death, Buell placed much of his wealth into three trusts: the Temple H. Buell Trust ("the Buell Trust"), the Temple H. Buell / Cherry Hills Trust ("the Cherry Hills Trust"), and the Temple H. Buell Charitable / Family Trust ("the Family Trust") (collectively, "the Trusts"). He also created the Temple H. Buell Foundation ("the Foundation"), a non-profit charitable organization. As part of its assets, the Foundation held 10% of the stock of the Buell Development Corporation ("the BDC"), while the Buell Trust held the other 90%.

Buell's last will, dated June 8, 1988, specifically excluded his children and left the residue of his estate to the Buell Trust, or, in the alternative, to the Foundation. The Buell Trust instruments in turn specified that at Buell's death,

its assets were to pass to the Foundation. As for the other trusts, the Family Trust included terms benefitting both the Foundation and Buell's grandchildren, and the assets of the Cherry Hills Trust were to pass to the Cherry Hills Arts and Culture Center at Buell's death.

Approximately two months before Buell's death, his children and grandchildren ("the Buell descendants") retained counsel to make claims arising out of Buell's disposition of his assets. They entered into negotiations with an attorney representing Buell, the Trusts, the Foundation, and the BDC. After Buell's death, counsel for the Buell descendants continued these discussions with attorneys representing Harold Williamson individually and in his capacities as Personal Representative of the Estate, Trustee of the Trusts, President of the BDC, and Executive Director and Trustee of the Foundation. These discussions continued for approximately eighteen months.

The negotiations culminated in a settlement agreement dated July 29, 1991. The agreement stated that it was entered into to save both sides the costs of litigation. It was executed by all of the Buell descendants, the Foundation, the BDC, and Williamson individually and in his capacities as personal representative of the Estate and as trustee of the Buell Trust and of the Cherry Hills Trust. It dissolved the Family Trust and passed its assets to the Buell Trust. It also provided that the Buell Trust, "on behalf of itself, the Estate, Trusts, BDC, and

-4-

Foundation," would pay $2,270,000 to the Buell descendants, App. at 224 ¶ 2, who agreed to release all claims against the Estate, Williamson, the Trusts, the Foundation, and the BDC.

The agreement listed eight of the Buell descendants' claims specifically: (1) detrimental reliance on Buell's promises of support; (2) misrepresentation by Buell concerning his intentions to provide for his descendants; (3) Buell's breach of contractual agreements made with his descendants to provide for them; (4) Buell's mistake of fact in disposing of his property; (5) interference by "[c]ertain Trustees or other representatives of the Foundation" with Buell's efforts to provide for his descendants through his will, the Trusts, or inter vivos transfers; (6) exertion of influence by "[t]he Trustee, trustees and/or other representatives of the Foundation, acting in their capacity as officers, directors, or other representatives of BDC" to cause Buell to direct BDC assets to the Trusts and the Foundation instead of to his descendants; (7) Buell's lack of testamentary capacity and lack of capacity to create trusts; (8) violations by Buell of a divorce decree under which he was required to provide for his grandchildren. App. at 222-23. Williamson and certain of the descendants later stated in depositions that both sides entered into the agreement primarily to avoid the litigation of tort claims of interference with inheritance, based on (5) and (6) above.

Relying on the fact that the Buell Trust, which provided funds for the settlement payment, was a revocable trust includable in Buell's gross estate for federal estate tax purposes, the Estate claimed the settlement payment as a deduction on its tax return dated April 5, 1991. On audit the Commissioner disallowed the deduction and on February 7, 1994, assessed a deficiency of $2,167,080. The Estate paid this amount in full, as well as $671,964.98 in interest for late payment. It filed a claim with the Internal Revenue Service on April 20, 1994, seeking a refund of the deficiency as well as $671,464.98 [1] in interest. The Commissioner denied the claim, and this suit followed on October 25, 1994.

On June 13, 1996, the district court decided the case on cross-motions for summary judgment. Lindberg v. United States, 927 F. Supp. 1401 (D. Colo. 1996). It granted the government's motion for summary judgment, denied the Estate's motion for summary judgment, and dismissed the suit. The Estate filed a motion for reconsideration on June 24, 1996, arguing that the court's decision was legally and factually erroneous. The court denied the motion the next day.

On August 21, 1996, the Estate filed a notice of appeal as well as a "Motion for Relief from or Modification of Judgment" under Fed. R. Civ. P. 60,

---

[1]This amount reflects the fact that the Estate filed its refund claim before making a final interest payment of $500.

"on the basis of mistake and inadvertence and to prevent a windfall and/or unjust enrichment to [the government]." App. at 148, ¶ 2. The motion did not specify under which subsection of Rule 60 it was brought. In its motion the Estate argued that the court had dismissed the action prematurely, without addressing issues regarding various amounts of interest which the Estate claimed entitled it to a refund of estate taxes.

The district court denied this motion in a one-page order on September 20, 1996. The court construed it as a Rule 60(b) motion for relief from "mistake, inadvertence, and excusable neglect," noting, "[n]othing in the motion fits this requirement of the rule." App. at 152. The court stated further, "[a]fter reviewing the pleadings, including the scheduling order, the court concludes that the judgment entered on June 13, 1996 is a final judgment adjudicating all claims raised by the pleadings. The claims sought to be asserted in this motion . . . would appear to require the filing of a separate civil action." Id.

The Estate filed a notice of appeal from the denial of this motion. On November 5, 1996, we consolidated that appeal and the Estate's appeal from summary judgment.

## II. DISCUSSION

-7-

We first address the deductibility of the settlement payment itself. We then discuss the Estate's Rule 60(b) motion regarding deductions and refund claims for various amounts of interest.

## A.  DEDUCTIBILITY OF THE SETTLEMENT PAYMENT

We review de novo the district court's grant of summary judgment, construing the factual record and the reasonable inferences therefrom in the light most favorable to the party opposing summary judgment.  Woodman v. Runyon, 132 F.3d 1330, 1337 (10th Cir. 1997).

The parties contest the true nature of the claims compromised by the Buell descendants in exchange for the settlement payment.  The United States points out that the settlement agreement listed will contest claims as well as tort claims; the Estate argues that the real reason for the settlement payment was to avoid only the litigation of the tort claims.  Construing the record in the light most favorable to the Estate, we proceed on the assumption that the settlement payment was made solely to avoid litigating tort claims against Williamson for interference with inheritance.

## 1. Deduction for Claims Against the Estate

The Estate argues that payments to settle these tort claims are deductible under I.R.C. § 2053(a)(3), which permits a deduction from the value of the gross estate for "claims against the estate." [2] The United States responds that the settlement payment is not deductible because it is a distribution of a portion of the estate, not the payment of a claim against the estate. Cf. First Nat'l Bank of Amarillo v. United States, 422 F.2d 1385, 1386 (10th Cir. 1970) (interpreting § 2053 and making the same distinction); Estate of Huntington v. Commissioner, 16 F.3d 462, 467-68 (1st Cir. 1994) (same). Both parties cite Treas. Reg. § 20.2053-4, which provides in relevant part:

> The amounts that may be deducted as claims against a decedent's estate are such only as represent personal obligations of the decedent existing at the time of his death, whether or not then matured . . . . Only claims enforceable against the decedent's estate may be deducted.

The regulation goes on to specify the deductibility of various kinds of "personal obligations":

---

[2]Section 2053(a)(3) reads in relevant part:

> For purposes of the [federal estate tax], the value of the taxable estate shall be determined by deducting from the value of the gross estate such amounts . . . for claims against the estate . . . as are allowable by the laws of the jurisdiction . . . under which the estate is being administered.

[With certain exceptions,] section 2053(c)(1)(A) provides that the allowance of a deduction for a claim founded upon a promise or agreement is limited to the extent that the liability was contracted bona fide and for an adequate and full consideration in money or money's worth. . . . Liabilities imposed by law or arising out of torts are deductible.

Id.

The Estate would have us read from this regulation a blanket rule that all tort claims paid by an estate are deductible. The regulation's language does not bear such a construction. The general rule that "[l]iabilities . . . arising out of torts are deductible" is still subject to the regulation's initial restriction: "[t]he amounts that may be deducted as claims against a decedent's estate are such only as represent personal obligations of the decedent existing at the time of his death . . . ." As indicated above, the claims here were tort claims against Williamson, not liabilities incurred by Buell before his death.

To overcome this obstacle, the Estate argues alternatively that Williamson's obligation was in substance Buell's obligation, because Williamson was essentially acting under Buell's authority. Williamson, "at the direction of Buell through his repeatedly expressed desire to exclude his descendants," influenced Buell not to succumb to a change of heart. Appellant's Br. at 23. It reasons further that Williamson would have been sued as a trustee of the Buell Trust, and that the Trust would have had to indemnify him. This right of indemnification

-10-

from a revocable trust, it argues, made Williamson's tort liability a "personal obligation[] of the decedent existing at the time of his death."

This is an unusual argument for an unusual situation. Typically an intentional interference with inheritance claim is paid by the tortfeasor, not by an estate or trust. To justify an estate tax deduction, the Estate must characterize the alleged tort as Buell's, who (through his trustee Williamson) tortiously influenced himself before his death.

This circuitous reasoning failed to convince the district court. It noted that "[t]he Descendants' allegation of tortious interference with inheritance was not against Buell, nor could it have been." 927 F. Supp. at 1405. For the following reasons, we agree that this was not Buell's personal obligation.

**a.**

The substance of the matter is that the claims at issue here (the Buell descendants' tort claims for interference with inheritance)[3] sought inheritances that the Buell descendants had been denied, not any amounts that Buell personally owed them before his death. For tax purposes, we characterize their claims as

_____

[3]Because we have accepted the Estate's premise that the only reason for the settlement payment was the compromise of the interference with inheritance claims, we need not determine whether any of the other claims in the settlement agreement represented a personal obligation of the decedent.

claims to inheritances for two reasons: (1) they were brought by the Buell descendants in their capacity as Buell's heirs at law; (2) compensatory damages for these claims would have been measured by the size of the inheritances with which Williamson allegedly interfered.

I.R.C. § 2053 and Treas. Reg. § 20.2053-4 "permit deduction for claims based on personal obligations of the decedent, not for payment to an heir claiming as such.  The status of the claimant  is the determinative factor . . . ." Pennsylvania Bank & Trust Co. v. United States , 597 F.2d 382, 384 (3d Cir. 1979) (citations omitted) (emphasis added).  Who  pays the claim, and in what capacity, is  not determinative.  Neither is the form of the action.

> To effectuate the policy underlying the federal estate tax
> requires that courts look beneath the surface of transactions to
> discover the essential character of each transfer.  Even where a claim
> is ultimately satisfied by the operation of law, the courts will
> determine the nature of the claim for federal tax purposes by
> examining the particular status of the claimant that enabled him to
> impose his claim on the estate.

Bank of New York v. United States , 526 F.2d 1012, 1017 (3d Cir. 1975) (footnote omitted);  accord  Huntington , 16 F.3d at 468.

Here, the Buell descendants' tort claims were based on their status as potential heirs.  Although Colorado state courts have not recognized the common law tort of intentional interference with inheritance, we assume for purposes of

-12-

decision that they would, [4] and treat the settlement agreement as a bona fide compromise of colorable claims. The elements of the tort are quite uniform across jurisdictions that have recognized it. Recovery in a suit for interference with inheritance requires proof of (1) a valid expectancy; (2) intentional interference with that expectancy; (3) independently tortious conduct (such as undue influence, fraud, or duress); (4) reasonable certainty that absent the tortious interference the plaintiff would have received the expectancy; and (5) damages. [5] Especially relevant here is the fact that the prima facie tort requires proof of "more than a mere expectancy"; plaintiffs must show "a tangible basis to assert a prospective inheritance, such as being an heir at law of the decedent or having been named in a prior will or testamentary instrument." [6] Beren v. Ropfogel, 24

---

[4]We made a similar assumption regarding Kansas law in Beren v. Ropfogel, 24 F.3d 1226, 1229 (10th Cir. 1994), and McKibben v. Chubb, 840 F.2d 1525, 1531 & n.9 (10th Cir. 1988). We note that federal cases arising in Colorado have recognized the tort. See Peffer v. Bennett, 523 F.2d 1323, 1326 (10th Cir. 1975); McGregor v. McGregor, 101 F. Supp. 848 (D. Colo. 1951), aff'd, 201 F.2d 528 (10th Cir. 1953).

[5]See, e.g., Sonja A. Soehnel, Annotation, Liability in Damages for Interference with Expected Inheritance or Gift, 22 A.L.R. 4th 1229 § 3 (1981 & Supp. 1998); Restatement (Second) of Torts § 774B (1979).

[6]The district court described the requisite status as that of "descendant of the testator." 927 F. Supp. at 1405. We think our statement in Beren is more precise, first because heirs need not be descendants, and second because persons who are not heirs still may bring claims of tortious interference with inheritance if they were named in a previous will and thereby acquired a valid expectancy. Of course, the claimants here were descendants as well as heirs at law.

F.3d 1226, 1230 (10th Cir. 1994) (emphasis added);    cf. Lyeth v. Hoey , 305 U.S. 188, 196 (1938) (holding (in income tax context) that for purposes of deductibility, a will contest settlement is an "inheritance" because of "the heirship which underlay the compromise, the status which commanded that agreement and was recognized by it").  [7]

Reinforcing this conclusion is the fact that compensatory damages for an interference claim are based on the amount the claimant would have received absent the interference.  Assuming the validity of their tort claims, the Buell descendants would have received substantial inheritances (not deductible to the Estate) if not for the tortious conduct of Williamson and others.  It makes no difference for estate tax purposes that instead these amounts were distributed only after threatened tort litigation for interference with inheritance.

The fact that the tort claims at issue here did not challenge the validity of Buell's testamentary instruments is irrelevant for tax purposes.  The form of the claim, a tort action instead of a will contest, is not determinative; both require

_____

[7]We emphasize that not all payments by an estate to family members or heirs are nondeductible distributions, only those payments made to "heir[s] claiming as such." Pennsylvania Bank & Trust Co., 597 F.2d at 384 (emphasis added).  For example, claims for unpaid child support or alimony would not be claims to a portion of an estate, because they are brought by children or former spouses to enforce a legal right to support, not by heirs claiming a right of inheritance.  Clearly such claims would represent personal obligations of a decedent at the time of his death.

that plaintiffs prove some status-based expectation of inheritance, and both provide a recovery commensurate with that expectation.

The possibility that Buell intended a different disposition of his Estate does not alter our analysis. For at least 18 years prior to his death, Buell expressly excluded his children from the terms of his trusts and from his will (although the Family Trust did include terms favorable to his grandchildren). Buell may truly have wanted the $2.27 million to stay in the Buell Trust and then to pass to the Foundation as a deductible charitable contribution; or perhaps (if not for the alleged tort) he would have changed his mind and given his descendants nondeductible inheritances. Rather than proceed to litigation on this issue, authorized representatives of the Buell Trust, the Foundation, and the Estate determined that, despite the express disclaimer in the will, Buell's true intentions were at least unclear enough to warrant giving his descendants $2.27 million. Whether or not the settlement accorded with Buell's intentions, his representatives made a choice from which flowed tax consequences. "[W]hile a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not . . . ." Commissioner v. National Alfalfa Dehydrating & Milling Co., 417 U.S. 134, 149 (1974). The Estate cannot now invoke Buell's supposed intentions as a shield against those consequences. A will contest settlement would not be

deductible merely by virtue of a possible conflict with the testator's intent; neither is the settlement of a tortious interference claim.

**b.**

An additional reason exists for upholding the district court's decision. Any tort liability here would have been Williamson's, not the Estate's. Even assuming that a right of indemnification from the Buell Trust would somehow have made Williamson's tort liability a personal obligation of the decedent, nevertheless Williamson was not entitled to such indemnification.

If, as the district court found, Williamson was threatened with suit only in his capacity as trustee of the Foundation, certainly he was not entitled to indemnification from the Buell Trust. Even if, as the Estate argues, Williamson would have been sued as trustee of the Buell Trust, the traditional rule is that an estate cannot be held liable for a tort committed by an executor or trustee. See, e.g., Herbert B. Chermside, Jr., Annotation, Liability of Estate for Tort of Executor, Administrator, or Trustee, 82 A.L.R.3d 892 §§ 2[a], 3 (1978 & Supp. 1998).

The Estate cites two exceptions to this rule, but neither applies here. First, Colorado law provides that "[c]laims based on . . . torts committed in the course of trust administration[] may be asserted against the trust estate by proceeding

-16-

against the trustee in his fiduciary capacity, whether or not the trustee is personally liable therefor." Colo. Rev. Stat. § 15-16-306(3) (1998); <u>see also</u> IIIA Scott on Trusts § 268 (4th ed.). Williamson's allegedly tortious acts were not committed "in the course of" the administration of the Buell Trust. The Buell descendants claimed that Williamson tortiously influenced Buell to leave all the Trust's assets to the Foundation when Buell otherwise would have changed the terms of the Trust to leave at least a portion to his family. Williamson had no business as trustee preventing Buell from modifying the terms of the Trust, advancing the interests of a current beneficiary at the expense of other potential beneficiaries.

Second, some courts have held that where a trustee's personal tort confers a benefit on the trust, tort victims have an equitable right to reach the trust estate to the extent of the benefit, when necessary to ensure compensation and to prevent unjust enrichment of the trust. <u>See</u> Chermside, <u>supra</u>, at § 4; IIIA Scott on Trusts § 269 (4th ed.). Influencing Buell to leave Trust assets to the Foundation instead of to the descendants did not confer any benefit on the Trust. Either way the Trust would have maintained its assets until Buell's death, at which time it would have passed all its assets to beneficiaries.

## 2. Deduction for Administrative Expenses

-17-

The Estate also argues that the settlement payment was a deductible "administrative expense" of the Estate under § 2053(a)(2). [8] Treas. Reg. § 20.2053-3(a) limits deductible administrative expenses to

> such expenses as are actually and necessarily, incurred in the administration of the decedent's estate; that is, in the collection of assets, payment of debts, and distribution of property to the persons entitled to it. . . . Expenditures not essential to the proper settlement of the estate, but incurred for the individual benefit of the heirs, legatees, or devisees, may not be taken as deductions. Administration expenses include . . . attorney[s'] fees . . . .

The Estate reasons that because the settlement avoided the payment of attorneys' fees to defend against the descendants' claims, it was in essence a deductible "prepayment" of attorneys' fees.

We are unpersuaded. Although the settlement payment may have been made to avoid the risk of litigation, it was not _actually_ a payment of attorneys' fees incurred in administering the estate. "[A] transaction is to be given its tax effect in accord with what actually occurred and not in accord with what might have occurred." National Alfalfa, 417 U.S. at 148. That the Estate could have chosen to incur deductible attorneys' fees instead of making a nondeductible

---

[8]Section 2053(a)(2) reads in relevant part:

> For purposes of the [federal estate tax], the value of the taxable estate shall be determined by deducting from the value of the gross estate such amounts . . . for administration expenses . . . as are allowable by the laws of the jurisdiction . . . under which the estate is being administered.

distribution of estate assets is irrelevant. For purposes of deductibility, avoiding attorneys' fees is clearly not the same as paying attorneys' fees, no matter how strong the courts' preference for settlement of lawsuits.

Furthermore, this was not an expense incurred "in the collection of assets, payment of debts, and distribution of property to the person entitled to it." It was not paid to avoid or facilitate a distribution of estate property; it was in fact itself a distribution of estate property, as we have explained. Again, the claimants' status as heirs is key. Determining the deductibility of "administrative expenses" involves "substantially the same considerations" as interpreting the phrase "claims against the estate." United States v. Stapf, 375 U.S. 118, 134 (1963). Payments to "heir[s] claiming as such" cannot qualify as deductible administrative expenses. Pennsylvania Bank & Trust Co. v. United States, 597 F.2d 382, 384 (3d Cir. 1979).

### 3. Deduction for Charitable Contributions

The Estate next contends that the settlement payment was in essence a deductible charitable contribution under I.R.C. § 2055, because it saved the Foundation (a charitable organization) substantial litigation costs. Section 2055(a)(2) allows a deduction for transfers "to or for the use of" certain

charitable organizations. [9] The Estate argues that had the Buell descendants proceeded with their tort claims, the Foundation could have been liable for the tortious acts of Foundation representatives. Instead, the Foundation approved the settlement payment out of Buell Trust money that would otherwise have passed to the Foundation under the terms of the Buell Trust instruments. Therefore, the Estate reasons, it is as though the Buell Trust made a deductible contribution of $2.27 million to the Foundation, which in turn paid the Buell descendants for release of their claims.

The plain language of the statute precludes this creative argument. The payment was not made "to or for the use of" the Foundation; it was made to the Buell descendants, to use any way they saw fit. Any benefit to the Foundation was incidental. Again, "a transaction is to be given its tax effect in accord with what actually occurred and not in accord with what might have occurred." National Alfalfa, 417 U.S. at 148. What actually occurred here was a payment to the Buell descendants, not to the Foundation.

_____

[9]Section 2055(a)(2) reads in relevant part:

> For purposes of the [federal estate tax], the value of the taxable
> estate shall be determined by deducting from the value of the gross
> estate the amount of all bequests, legacies, devises, or transfers . . .
> to or for the use of any corporation organized and operated
> exclusively for religious, charitable, scientific, literary, or
> educational purposes . . . .

## B. MOTION FOR RELIEF FROM OR MODIFICATION OF JUDGMENT

The Estate contends that the district court abused its discretion in denying the Estate's Motion for Relief from or Modification of Judgment under Fed. R. Civ. P. 60(b). [10] The Estate argues that due to mistakes by counsel and/or the court, the court erroneously dismissed the Estate's suit without addressing three of its arguments relating to various amounts of interest. Although the Estate bases its appeal on Rule 60(b)(1) as well as Rule 60(b)(6), "we need not rigidly compartmentalize our analysis upon review. Instead, we look to the record in its entirety to see if the trial judge clearly ignored excusable conduct or failed to recognize some other compelling reason for relief to be granted." Pelican Production Corp. v. Marino, 893 F.2d 1143, 1146 (10th Cir. 1990) (citations omitted). Our review here is "meaningfully narrower" than review of the merits of a direct appeal. Bud Brooks Trucking, Inc. v. Bill Hodges Trucking Co., 909 F.2d 1437, 1440 (10th Cir. 1990). Relief under Rule 60(b) is extraordinary and may be granted only in exceptional circumstances. Id.

---

[10]The rule provides in relevant part:

> On motion and upon such terms as are just, the court may relieve a party . . . from a final judgment . . . for . . . (1) mistake, inadvertence, surprise, or excusable neglect; . . . or (6) any other reason justifying relief from the operation of the judgment.

-21-

In its motion to the district court, the Estate argued that it merited administrative expense deductions for (1) the $671,964.98 in interest paid on the audit deficiency and (2) $139,453 in interest paid to the State of Colorado on late-paid state inheritance taxes. [11] The Estate admitted that "due to mistake and inadvertence of Counsel" it had not raised or reserved these issues in its motion for summary judgment. Id. at 150, ¶ 13. The Estate also sought a refund of a portion of the $671,964.98 in interest paid on the audit deficiency. It noted that the IRS had previously refunded a portion of the deficiency after allowing the Estate a credit for state inheritance taxes paid, and argued that the IRS should also return $116,787.50 in interest corresponding to this partial refund.

We conclude that the Estate never raised these arguments prior to entry of judgment, and therefore the court had no duty to address them. The Estate's motion for summary judgment made no reference to these issues. In addition, although its complaint did make two references to "interest," it asked only for interest in addition to the refund of taxes paid. It asked for "judgment against Defendant in the total amount of $2,167,080 plus interest previously paid to the Internal Revenue Service in the amount of $671,464.98, plus interest as provided

---

[11]In the district court the Estate also claimed a deduction for attorneys' fees in connection with its dispute with the Buell descendants and for litigation of tax issues. In its briefs on appeal, the Estate has not disputed the district court's resolution of this issue; therefore we do not address it.

by law, costs, attorneys' fees, and such other and further relief as this Court deems appropriate." App. at 2 (emphasis added). This "catchall" demand for "judgment . . . plus interest" did not apprise the court of the three specific claims the Estate later raised in its Rule 60 motion. Two of these three claims were based on the payment of state inheritance taxes; the court could not possibly have ruled on these claims because the state taxes were not even mentioned in the complaint. The other interest-related claim requested a _deduction_ for the interest paid to the IRS on the audit deficiency. Although the complaint did ask for a _refund_ of this interest, it did not claim a deduction in the event the refund was denied.

In these circumstances, the district court's denial of the Estate's motion was not an abuse of discretion. [12] There has been no showing of grounds for relief

---

[12]Even if the district court had addressed the Estate's claims, it likely could not have granted relief because the Estate had not previously made these specific arguments in refund claims filed with the IRS, as required by I.R.C. § 7422(a):

> No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected . . . until a claim for refund or credit has been duly filed with the Secretary [of the Treasury], according to the provisions of law in that regard, and the regulations of the Secretary established in pursuance thereof.

Treas. Reg. § 301.6402-2(b) further provides that a refund claim "must set forth in detail each ground upon which a credit or refund is claimed and facts sufficient to apprise the Commissioner of the exact basis thereof." See also Angle v. United
(continued...)

-23-

under Rule 60(b)(1).   <u>See</u> <u>Pelican</u>, 893 F.2d at 1146.  Furthermore, we see nothing sufficiently "unusual or compelling" here to warrant relief under Rule 60(b)(6). <u>See</u> <u>id.</u> at 1147.  We realize this may result in a windfall to the government, but so will every failure to claim an available deduction or refund.

Accordingly, we AFFIRM the judgment of the district court as well as its denial of the Estate's Rule 60(b) motion.

---

[12](...continued)
<u>States</u>, 996 F.2d 252, 254 (10th Cir. 1993).  The one refund claim filed by the Estate included only a "catchall" interest clause similar to the one in its complaint.

96-1403, 96-1472, *Lindberg v. United States*

**LUCERO** , Circuit Judge, concurring.

Although I respectfully agree with the compelling analysis of my colleagues, I write separately to express my concern with an injustice occasioned by the peculiar circumstances of this case. The purpose of the estate tax charitable deduction is to promote testamentary transfers to qualified charitable organizations. Yet, when an estate settles a claim in a bona fide effort to respect a testator's charitable intent, tax on such settlement is paid by the estate, and hence—in cases such as that before us—by the charity as residuary. More paradoxical still, Treasury Regulations provide that "[i]f a charitable organization assigns or surrenders a part of a transfer to it pursuant to a compromise agreement in settlement of a controversy, the amount so assigned or surrendered is not deductible as a transfer to that charitable organization." 26 C.F.R. § 20.2055-2(d).

Buell's last will specifically excluded his descendants and left the residue of his estate to the Buell Trust and thereby the Foundation. Faced with hostile claims from certain descendants, the Buell Trust took what it considered prudent steps in settling the descendants' claims. The good faith of the Trustee in effecting that settlement has not been placed at issue by the government, which is to be expected, considering that under the existing tax scheme the government need not challenge the bona fides of the fiduciary in order to prevail. Good faith

or bad—the Internal Revenue Service wins out.  I fail to see why the federal government should gain, and charities thereby lose, when third parties successfully usurp a testator's charitable wishes.